# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Sexton v. City of Chicago*, 2012 IL App (1st) 100010

---

| | |
|---|---|
| Appellate Court Caption | BERNADETTE SEXTON, Individually and as Independent Executrix of the Estate of Gerald S. Sexton, Deceased, Plaintiff-Appellant, v. THE CITY OF CHICAGO, a Municipal Corporation, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-0010 |
| Filed | August 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the death of plaintiff's husband when the vehicle he was driving was struck by a train at a dangerous intersection, the grant of defendant city's motion for judgment notwithstanding the $5 million verdict for plaintiff was upheld on the ground that section 104 of the Tort Immunity Act immunized the city from liability for failing to install special traffic control devices. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 05-L-917; the Hon. Donald J. Suriano, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Larry R. Rogers, Jr., of Power Rogers & Smith, P.C., of Chicago, for appellant.

Mara S. Georges, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Jennifer M. Erickson Baak, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justice Quinn[1] concurred in the judgment and opinion.
Justice Howse dissented, with opinion. |

**OPINION**

¶ 1    This case arises out of a collision between a commuter Metra[2] train and a passenger vehicle (a Ford Escort station wagon), which occurred on February 10, 2004, at the intersection of 111th and Marshfield Streets in Chicago, and which resulted in the death of the vehicle driver, Gerald Sexton. Gerald's wife, Bernadette Sexton, the plaintiff in this cause, both individually and as the independent executrix of Gerald's estate, filed a complaint at law alleging negligence and willful and wanton misconduct against several defendants, including, pertinent to this appeal, the City of Chicago (City). The plaintiff alleged that the City, which operated and maintained the preemption traffic control system at the intersection of 111th and Marshfield Streets, negligently failed to include in that preemption system a blank-out sign or a warning signal, which would alert drivers that they would be crossing a train track immediately after making a westbound right turn onto 111th Street.

¶ 2    After a jury trial, the jury returned a verdict in favor of the plaintiff in the amount of $5 million. The City filed a motion for judgment notwithstanding the verdict, arguing that it was entitled to judgment as a matter of law on several grounds. First, the City argued that it was immune from suit pursuant to section 3-104 of the Local Governmental and Governmental

---

[1]We note that Justice Joseph Gordon participated in the oral argument in this case, as well as its initial disposition. However, after the plaintiff's petition for rehearing was granted and while the cause remained pending before this court, Justice Gordon died on June 26, 2012. The case has since been reassigned to Justice Patrick J. Quinn, who has been apprised of its history, read the briefs, reviewed the record and listened to oral arguments online.

[2]Metra is the operating name for the Northeast Regional Commuter Railroad Corporation which runs commuter throughout the Chicagoland area.

Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-104 (West 2006)), which immunizes municipalities for failures to initially install traffic control devices. Second, the City contended that insofar as the plaintiff's claim was based upon a theory of negligent design in the traffic control preemption system, it was barred by a 10-year statute of repose (see 735 ILCS 5/13-214(b) (West 2006)). Finally, the City argued that the plaintiff's claim was barred by section 5(a) of the Illinois Workers' Compensation Act, which prohibits an employee from recovering in common law for injuries sustained in the scope of his employment, and provides him exclusively with workers' compensation benefits as a remedy for such injuries (see 820 ILCS 305/5(a) (West 2006)). The circuit court granted the City's motion for judgment *n.o.v.*, finding that the City was entitled to absolute immunity pursuant to section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)).

¶ 3        The plaintiff now appeals, contending that the judgment *n.o.v.* was improper under any of the City's three claims and that we should reverse that finding and reinstate the jury verdict. In the alternative, the plaintiff asserts that we should reverse and remand for a new trial because the trial court abused its discretion in denying her request to instruct the jury with a far more comprehensive version of Illinois Pattern Jury Instructions, Civil, No. 20.01 (Illinois Pattern Jury Instructions, Civil, No. 20.01 (3d ed. 1989) (hereinafter, IPI Civil 3d No. 20.01)), which would have included over a dozen specific alleged acts of negligence against the City. In the very least, the plaintiff contends that we should reverse the trial court's decision to deny her leave to file her third amended complaint, so as to permit her to address any shortcomings in her pleadings and to proceed further with this case. Specifically, the plaintiff asks that we permit her to amend her complaint to include the dozen additional alleged acts of negligence against the City that she attempted to include in her jury instructions, but failed to specify in her second amended complaint. For the reasons that follow, we affirm.

¶ 4                                            I. BACKGROUND

¶ 5        The following facts are undisputed. Interstate Route 57 (hereinafter, I-57) runs north-south and parallel to Marshfield Street. For vehicles traveling southbound on I-57 there is an exit onto Marshfield Street, which continues to run parallel to I-57 on the east and parallel to the Metra train tracks on the west. The first intersection encountered by a southbound vehicle traveling on Marshfield is the 111th Street crossing. At the 111th Street crossing, Marshfield Street is comprised of three lanes: (1) a left lane for left (east) turning traffic; (2) a center lane for traffic continuing straight ahead on Marshfield Street and (3) a right lane, from which traffic can either continue straight onto Marshfield Street or turn right (west) onto 111th Street. A vehicle turning right (west) onto 111th Street encounters the Metra train tracks within 200 feet of that turn. Metra owns and operates the crossing gates and the cantilever lights located immediately in front of the train tracks. The City, however, owns and operates all of the traffic lights at the intersection of 111th and Marshfield Streets. On February 10, 2004, the plaintiff's husband, Gerald, was killed by a Metra train, which struck his vehicle after it made a right (west) turn from Marshfield Street onto 111th Street and attempted to cross the train tracks.

¶ 6        The record reveals that after her husband's death, on February 10, 2005, the plaintiff filed her first amended complaint against the City of Chicago,[3] alleging negligence and willful and wanton misconduct. She filed her second amended complaint on July 10, 2006. That complaint specifically alleged that the City was negligent and showed an utter indifference to or conscious disregard for Gerald's safety in the following manner: (1) failing to have an adequate warning control system at the crossing, including adequate warning signs, lamps whistles or bells; (2) failing to properly coordinate the traffic lights in conjunction with the crossing gates in violation of section 11-304 of the Illinois Vehicle Code (625 ILCS 5/11-304 (West Supp. 2003)); (3) failing to have a proper functioning traffic system to prevent vehicles from entering the grade crossing as a train was approaching; and (4) being otherwise negligent or otherwise showing an utter indifference or conscious disregard for the safety of vehicles approaching the grade crossing.

¶ 7        Discovery continued for the next several years, during which the following relevant pleadings were filed by the parties. On February 2, 2007, Metra filed a contribution claim against the City repeating the allegations contained in the plaintiff's second amended complaint against the City, but adding that the City was also negligent because it failed to heed to the advice and the directives from the Illinois Department of Transportation (hereinafter, IDOT) to install a "no right turn" sign or arrow for southbound Marshfield Street drivers advising them that the railroad warning signals had engaged and that they should not make a right turn and proceed into the railroad right of way.

¶ 8        On June 25, 2008, the City filed its first motion for summary judgment against both the plaintiff and Metra, arguing that it was immune from liability[4] for failing to install warning devices at the 111th Street railroad crossing pursuant to section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)), which immunizes failures to initially install any traffic control device. The City also argued that the plaintiff's and Metra's contention that the City had failed to coordinate the traffic lights with the crossing gates at the 111th Street crossing was essentially a claim for negligent design of the preemption system and was therefore barred by the 10-year statute of repose, which bars claims for negligent design if not filed within that statutory period (see 735 ILCS 5/13-214(b) (West 2006)). After a hearing on the merits, the circuit court denied the City's motion on October 22, 2008.

¶ 9        On March 5, 2009, the City filed its second motion for summary judgment against the plaintiff (and Metra) alleging that the plaintiff's claim was barred by the exclusivity

_____

[3]The plaintiff filed her initial complaint on January 25, 2005, naming only Metra as the defendant. Soon thereafter, however, she amended that complaint, and on February 10, 2005, named several more defendants, aside from Metra, including Rock Island Railroad, Union Pacific Railroad, Burlington Northern Railroad, the State of Illinois, and as pertinent to this appeal, the City of Chicago.

[4]With respect to Metra, the City argued that since it was immune from liability, it was therefore also impervious to any contribution claim.

provision of the Workers' Compensation Act (see 820 ILCS 305/5(a) (West 2006)).[5] Specifically, the City argued that since, at the time of the accident, Gerald was on duty as an employee of the City and had acted within the scope of his employment, the plaintiff, as executrix of Gerald's estate, was entitled to and had been compensated for his death pursuant to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2006)). The City therefore argued that because the plaintiff had already been compensated under the provisions of the Act, pursuant to section 5(a) of the Workers' Compensation Act (see 820 ILCS 305/5(a) (West 2006)), she could not also proceed with her common law negligence claim.

¶ 10    In support of this contention, the City filed an offer of proof regarding an agreement reached by the City and the plaintiff regarding Gerald's workers' compensation death benefit claim. That offer of proof included uncertified copies of: (1) an application for adjustment of claim form filed by the plaintiff pursuant to the Workers' Compensation Act on April 1, 2004, and (2) the plaintiff's request for a hearing on that matter. The hearing request form reveals that the City and the plaintiff were prepared to try the matter to its completion on February 27, 2009, unless the arbitrator approved other arrangements. The request further reveals that the plaintiff and the City specifically stipulated to the following relevant facts: (1) that Gerald and the City were operating under the Illinois Workers' Compensation Act and that their relationship was one of employee and employer; (2) that Gerald sustained accidental injuries that arose out of and in the course of employment; (3) that his death was causally connected to this injury; (4) that the City was given notice of the accident within the time limits set forth in the Act; (5) that Gerald's yearly earnings were $70,441.28; (6) that at the time of the injury Gerald was 60 years old; and (7) that the City paid $237,858.34 in death benefits to the plaintiff as executrix of Gerald's estate.

¶ 11    The plaintiff responded to the City's second motion for summary judgment by arguing that she could proceed with her negligence claim because the dual capacity doctrine applied as an exception to the exclusive remedy provision of section 5(a) of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2006)). Specifically, the plaintiff argued that because Gerald was employed by the City's department of general services, while the traffic light at the intersection of 111th and Marshfield Streets was maintained by the City's department of transportation, the City had acted in a dual capacity and had owed duties to the general public which were not the same as those it owed to Gerald as an employee.

¶ 12    At the hearing on the City's second motion for summary judgment, the circuit court first noted that, although not argued by the plaintiff in her response to the City's second motion for summary judgment, it was apparent to the court that the City had failed to raise the exclusivity provision of the Workers' Compensation Act as an affirmative defense in any of its prior pleadings (particularly its answer and first motion for summary judgment).[6] The

---

[5]With respect to Metra, the City alleged that since the plaintiff was barred from any common law negligence claim, it also owed no contribution to Metra.

[6]The record reveals that the waiver issue was brought to the circuit court's attention by a footnote in Metra's response to the City's second motion for summary judgment which cursorily noted that failure to raise an affirmative defense in an answer is a waiver of that defense.

plaintiff, then, invited by the court, and with the help of Metra's counsel, argued that the City had waived the exclusive remedy provision of the Workers' Compensation Act as an affirmative defense because it waited to raise it for the first time in the fifth year of litigation and with a trial date already set. The City responded to the waiver argument by explaining that it had not pleaded this affirmative defense earlier because the workers' compensation case was itself still pending, and that once it had been decided and settled on February 27, 2009, the City immediately filed its second motion for summary judgment raising the defense.

¶ 13   The circuit court denied the City's second motion for summary judgment. It is unclear from the record whether the circuit court denied the motion on the merits or on waiver grounds. The record reveals that the court first found that the City had acted in a dual capacity with legal obligations independent of those imposed upon it as an employer, namely, its duty to the public as a whole to maintain safe roads. The court specifically stated:

"The court is denying the City's motion for summary judgment. The exclusive remedy provision of section [5(a)] *** of the Workers' Comp Act includes several exceptions, and the Court has focused on the dual capacity doctrine, or as some courts have called it, the dual persona doctrine.

In this case, the City operated as an employer and it operated in a second capacity that *** confers upon it obligations independent of those imposed upon it as an employer.

The court has relied on a variety of cases, *Smith*, *Sobczak* *** and *Ocasek*.

Plaintiff and Metra have clearly shown that the City had a dual capacity in the instant case, and that in its second capacity *** 'generates obligations unrelated to those flowing from the first, that of employer.'

* * *

The City of Chicago clearly owed a duty to the public in general to maintain and operate traffic control systems, and this duty is wholly independent of any duty owed to Mr. Sexton as employer.

Finally, in the most recent case, *Sobczak* *** points out that section 5(a) immunity exists if there is a significant legal relationship between the plaintiff and defendant separate and apart from the employer-employee relationship."

¶ 14   However, in a subsequent colloquy between the circuit court and the City's counsel, the court also made the following comments:

"THE COURT: Secondly, the Court doesn't need to get there, but the Court accepts the arguments of Metra and [defense counsel] in regard to the City's waiver. The City failed to plead in its answers immunity under section 5(a) of the Workman's Comp Act and the statute of limitations, and the City should have pled that.

Sir, can I ask why the City didn't plead it after five years?

MR. GLOCKNER: Judge, the workers'–

THE COURT: It wasn't very hard to plead–

MR. GLOCKNER: The workers'–

-6-

THE COURT: –was it?

MR. GLOCKNER: The workers' compensation case was pending until very recently. It was resolved very shortly ago; actually, February 27th of 2009.

THE COURT: Well, you still–the City still should have pled that."

¶ 15    After the circuit court's denial of its second motion for summary judgment, the City moved for leave to raise the exclusivity provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2006)) as an affirmative defense, arguing that because the plaintiff was the party prosecuting the workers' compensation claim, and was represented by attorneys in both that claim and her civil suit against the City, she would not be surprised or prejudiced by this additional affirmative defense, especially since its basis was a legal and not a factual one. The circuit court, however, denied this request.

¶ 16    The case finally proceeded to trial on July 24, 2009. The plaintiff presented 10 witnesses: (1) Dr. Susanne Botana, who witnessed the accident from her vehicle, which was immediately behind Gerald's vehicle as it drove from Marshfield Street onto 111th Street and then the train tracks; (2) Chicago's department of transportation field service director, George Black II; (3) Robert Houghton, the City's former supervisor of traffic signal repairmen; (4) James R. Loumiet, an expert witness in accident reconstruction and highway safety; (5) Dr. Eupil Choi, the medical examiner; and (6) Gerald's surviving family members, including the plaintiff (his wife), and his four sons, Thomas, James, Tim and Joseph Sexton. The City, in turn, presented the testimony of: (1) Edward J. Dolenak, the Metra engineer who conducted the train that hit Gerald's vehicle on February 10, 2004, and (2) Metra's signal engineering director, William P. Komenski.

¶ 17    For purposes of brevity, we summarize only that evidence presented at trial which is relevant to the issues raised on appeal. Susanne Botana testified that she was present at the intersection of 111th and Marshfield Streets at the time the Metra train struck Gerald's vehicle. She described the intersection by pointing out that southbound traffic arrives at the intersection via an off-ramp from I-57. She explained that where the ramp off meets the intersection, the ramp comprises three lanes, a left lane for left-turning traffic, a center lane for traffic continuing straight ahead on Marshfield Street, and a right lane from which traffic could go either straight or turn right onto 111th Street. According to Botana, southbound traffic at the intersection was controlled by a "straight red, yellow and green light." Botana testified that there were no signs for southbound traffic advising them that there is a railroad crossing immediately after turning right onto 111th Street. There was also no indication drivers could not make right turns onto 111th Street under certain conditions.

¶ 18    Botana next testified as to what she observed on February 10, 2004. She stated that she was driving behind Gerald on the off-ramp approaching 111th and Marshfield Streets when she observed him stop at the intersection, and then turn right. Botana did not see what color the light was when Gerald turned right. She testified, however, that when she arrived at the intersection, the light was green and she therefore also proceeded to turn right onto 111th Street. As she rounded the corner, she saw the railroad gate lowering as Gerald was crossing the intersection. Botana stopped before the gate and heard a train whistle. She saw Gerald stop, with the railroad gate lowered behind him, look both ways, and put his car into reverse.

Then she saw his car struck by the Metra train. Botana testified that only a few seconds passed between the time Gerald stopped and the time his car was struck by the train.

¶ 19    On cross-examination, Botana admitted that there are lights in front of the train tracks next to the ramp, which flashed red before the gate started coming down. Botana also admitted that she definitely observed Gerald stop at the intersection of 111th and Marshfield Streets before turning right. She also acknowledged that Gerald stopped at the railroad tracks and that the red lights were flashing when he did so.

¶ 20    Chicago's department of transportation field service director, George Black II, next testified that in February 2004, he was responsible for all of the City's day-to-day operations related to traffic signal installations. Black testified that he is familiar with the Manual on Uniform Traffic Control Devices (MUTCD) and that it is a national standard for what types of advanced warning signs should be placed at certain intersections. Black explained that in 2004, the City of Chicago had not officially adopted the MUTCD as its mandated guidelines but rather that it used it only as a reference tool. Black acknowledged that the MUTCD addresses the types of traffic devices that should be utilized when traffic signals are preempted.

¶ 21    Black next acknowledged that on the day of the accident, the City had a traffic control device regulating southbound traffic at the intersection of 111th and Marshfield Streets, namely, a basic red, yellow, and green traffic light. Black admitted that southbound traffic at this intersection was permitted to make right (west) turns onto 111th Street either on a green or a red light. Black also acknowledged that there was a preemption sequence in place at 111th and Marshfield Streets on the date of the accident. He explained that preemption occurs when some other device, such as a railroad, sends a signal to a traffic control device, in this case traffic lights owned by the City, altering its regulation of the intersection. According to Black, when preemption occurs at 111th and Marshfield Streets, the traffic signals change to clear traffic off the tracks. In other words, when a train is approaching the train tracks, a signal is sent to the preemption device to change the lights on the traffic signal and prevent cars from crossing the tracks.

¶ 22    Black further admitted that in 1999 the Illinois Department of Transportation (IDOT) provided the City with a report concerning the regulation of the intersection at 111th and Marshfield Streets. The report recommended that the City install certain signs at the intersection, including: (1) an "advance warning" sign for southbound Marshfield Street traffic that would advise drivers that a railroad crossing was nearby; (2) a "do not stop on track" sign; (3) a "do not turn on red" sign; and (4) a fiber-optic preemption "blank-out" sign. Black explained that a "blank-out" sign is a black sign with a message that can be illuminated at certain times, for example, to prohibit right turns only when a train is approaching. Black conceded that none of these signs was present at the intersection in 2004. He also admitted that long before 2004, the City had used blank-out signs with traffic control signs to work in preemption mode at various other locations throughout the City.

¶ 23    Black also testified that in 1996 the City made improvements to the intersection of 111th and Marshfield Streets. Black explained that the City placed a "Stop Here on Red" sign for eastbound traffic on 111th Street in the intersection, and painted a white line four feet from

the railroad tracks on 111th Street.

¶ 24    Robert Houghton next testified that in February 2004, he worked for the City's bureau of electricity and supervised all traffic signal repairmen, including those responsible for maintaining the traffic control device at the intersection of 111th and Marshfield Streets.

¶ 25    Houghton acknowledged that in 2004 the City recognized the MUTCD as a reference tool for setting up traffic signals. According to Houghton, both the 2000 and 2003 versions of the MUTCD recommended that all turning movements toward railroad tracks be prohibited during signal preemption. He further acknowledged that the MUTCD provides options for ways to prohibit such turns during signal preemption, including, among other things, a "blank-out" or "changeable message" sign. Houghton agreed that a no-right turn sign placed at the corner of 111th Street and Marshfield Streets could have prohibited drivers from making right turns toward the tracks when the train was approaching.

¶ 26    Houghton next explained that the preemption sequence at 111th and Marshfield Streets was designed in 1993, that it was implement in 1994, and that the design of the traffic control device had not changed since then. Houghton agreed that under the existing traffic control system in place in 2004, southbound Marshfield traffic was permitted to turn right on both the red and green lights, and that this was true even when the traffic signal was in preemption mode. When asked if it was true that "there is no distinction in the signal, from a driver's perspective when the system is in preemption and when it is under normal operation," Houghton agreed, stating, "It's just a traffic corner with lights. That's it."

¶ 27    Houghton further explained, however, that this was how the preemption system was designed to work. Specifically, Houghton pointed out that under the preemption system in place in 2004, when a train approached the intersection of 111th and Marshfield Streets, a call would come into the traffic control box, which was linked to the stop lights at the intersection. During the entire railroad call, when the system would go into preemption mode, the system was designed to provide all motorists coming from the I-57 ramp with a green light, so as to permit southward traffic on Marshfield Street, which is parallel to the tracks, to continue forward and not back up traffic on the highway. The system was further designed to provide all other traffic, namely, traffic going westbound on 111th Street, with a red light, so as to keep any vehicles off the track. Houghton explained that if a vehicle traveling west on 111th Street was close to the track when the preemption system was triggered, the stop light for westbound traffic would turn amber before it turned red to permit the driver to clear the track. Otherwise, it would turn into a solid red and remain such until the train cleared the tracks. Houghton also stated that traffic going westbound on 111th Street is stopped before Marshfield Street.

¶ 28    The plaintiff next proceeded by reading several of the City's stipulated admissions to the jury. The first was the City's admission with respect to its September 17, 1999, letter. This letter acknowledged the City's receipt of a June 22, 1999, report prepared by IDOT[7] recommending the following modifications to the intersection at 111th and Marshfield

---

[7]This report was titled "The 111th Street and Marshfield Avenue Traffic Railroad Signal Report."

Streets: (1) a no-turn-on-red sign; (2) a caution sign; (3) a walk-time-shortened-when-train-approaches sign; and (4) a railroad advance warning sign on southbound Marshfield Street off the ramp, to warn motorists making right turns that there is a railroad crossing ahead. The report also recommended that a fiber optic preemption blank-out sign be installed for southbound traffic on Marshfield to prohibit right turns onto 111th Street during railroad preemption. In addition to acknowledging its receipt of the IDOT report, in its June 22 letter the City indicated that it consciously chose not to take the acts described and recommended by the report. Specifically, according to the letter, the City did not agree with the recommendation to install the no-right-turn blank-out sign as proposed since they are "ignored by drivers" and would confuse the drivers and "contribute to the degradation of a driver's adherence to the necessary turn restrictions."

¶ 29    The plaintiff next called James R. Loumiet, who was qualified as an expert witness on accident reconstruction and highway safety. Loumiet testified that the MUTCD is a national standard for traffic devices, which has been adopted by the federal government and the state of Illinois.[8]

¶ 30    According to Loumiet, in 2004 the MUTCD would have required a blank-out sign at the intersection of 111th and Marshfield Streets. In particular, he stated that the MUTCD recommended prohibiting turns from intersections within 200 feet of railroad crossings and provided options for accomplishing this, including, among other things, a blank-out or changeable message sign. Loumiet explained that he examined the intersection at 111th and Marshfield Streets and discovered that the distance between the stop line for southbound traffic and the railroad gate was 76 feet and 7 inches, and that it therefore fell well within the MUTCD's requirement for a blank-out sign.

¶ 31    Loumiet further testified that in 2004 there was no other prohibition against southbound traffic making a right turn on Marshfield Street toward the railroad crossing. He explained that although the City owned and operated a preemption system at that crossing, when the traffic signal for southbound Marshfield traffic was in preemption mode, southbound motorists would see either a red or a green light, both of which authorized them to make a turn onto the train tracks. Similarly, Loumiet noted that there was no advance warning sign on Marshfield Street notifying motorists that there was a railroad track running parallel to them or that they were about to approach a railroad crossing. Loumiet concluded that "had the City placed the advance warning sign and/or a blank-out sign prohibiting right turns, this collision more likely than not would not have occurred."

¶ 32    Loumiet next opined about the City's maintenance of the intersection at 111th and Marshfield Streets. He stated that the City's preemption system at this intersection was designed in 1993 and activated in 1994. Furthermore, Loumiet discovered that in 1996, the City issued work orders to install a new stop-here-on red sign and stop line for eastbound traffic on 111th Street. According to Loumiet, despite a 1999 IDOT report evaluating this

_____

[8]With respect to Illinois's adoption of the MUTCD, Loumiet explained that although Illinois has its own manual, it is in substantial conformance with the national MUTCD, in addition to containing several more requirements.

intersection and recommending, *inter alia*, that "advance warning signs and fiberoptic preemption blank-out signs be installed to prohibit right turn[s] from the southbound approach," City engineers declined to implement these changes, concluding that they are "ignored by drivers" and "contribute to the degradation of drivers's adherence to necessary turn restrictions." Based on all of these documents, Loumiet concluded that the City's maintenance of the traffic control system did not conform to the MUTCD.

¶ 33    After the plaintiff rested, on July 28, 2009, the City moved for a directed verdict, again arguing that it had absolute immunity pursuant to section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)) and that it was under no obligation to modify the traffic light sequence at the intersection of 111th and Marshfield Streets. The trial court denied this motion, and the City proceeded with its defense, presenting two witnesses.

¶ 34    The first witness, William P. Komenski, the director of signal engineering at Metra, testified that he was responsible for the installation of Metra's signals at the intersection of 111th and Marshfield Streets. According to Komenski, at that railroad crossing, Metra had cantilevered lights and bells on either side of the tracks, and gates behind the cantilevers. Each of the gates also had lights on it, a couple that flashed and one that steadily stayed on, while the train was approaching. Komenski testified that the gates were not designed or intended to be physical barriers that could stop traffic but rather that they were intended merely as warning devices. According to Komenski, the gate was counterweighted and was not designed with a downward force. Therefore, if a gate were hit by a car at slow to moderate speed, it would be pushed up and ride over the windshield of the car. According to Komenski, it was possible for a gate to come up the windshield of a car and then come back down.[9]

¶ 35    Komenski next testified that in 2004 Metra had a "constant warning time system" in place at the intersection of 111th and Marshfield Streets. This system is a computer-controlled system attached to the rails, which takes into account the speed of an approaching train to ensure that the warning signals at the railroad crossing are activated in such a manner that motorists receive the same amount of warning time for all approaching trains. Komenski testified that although the state requires a constant warning time of 25 seconds, Metra added an additional 10 seconds to its system, so that motorists were given a total of 35 seconds warning time before every train. Komenski explained that when a train is approaching, the first thing the system does is to active the warning lights and bells at the railroad crossing. After three to five seconds, the gates begin to come down. Komenski stated that it takes the gates 8 to 10 seconds to reach a fully lowered position. Up to 20 seconds would then pass between the time the gates are fully lowered to the time of the arrival of the train.

¶ 36    Komenski next averred that after Gerald's death he tested the "constant warning time system" at the intersection of 111th and Marshfield Streets to determine whether it was functioning properly. Based on the maintenance records taken immediately after the accident

---

[9]On cross-examination, however, Komenski admitted that he had never actually seen this happen. He conceded, however, that he has seen broken gates, made by vehicles driving through them.

as well as the locomotive event record and the data transmitted by the computer system during the accident, Komenski determined that the system functioned as intended and that it had provided Gerald the proper warning time.

¶ 37   The City next called Edward J. Dolenak, the Metra engineer who conducted the train that hit Gerald's vehicle on February 10, 2004. Dolenak testified that as he was driving the Metra train on that day, heading southbound parallel to Marshfield Street, he saw Metra's cantilever lights at the 111th Street crossing flashing as far away as the crossing at 107th Street. Dolenak stated that as he approached the 111th Street crossing, he saw Gerald's car rounding the corner from Marshfield Street, and he blew the train's horn to warn Gerald. According to Dolenak the gates at the 111th Street crossing were in the fully lowered position when the train was still four to six train car lengths away from the 111th Street crossing. Dolenak saw Gerald's car start to go underneath the crossing gate, so he hit the train's emergency break. The train collided with Gerald's car.

¶ 38   After Dolenak's testimony the City rested, and counsel proceeded with closing arguments. The jury was subsequently instructed that it could find the City negligent on the following three theories, namely, that the City had: (1) failed to provide adequate warning signs at the intersection of 111th and Marshfield Streets; (2) failed to provide a traffic control system that prohibited a vehicle from turning right from Marshfield Street to 111th Street, including, but not limited to, a blank-out sign; and (3) allowed motorists to turn right from Marshfield onto 111th Street during the approach of a train.[10] After deliberations, the jury returned a verdict in favor of the plaintiff in the amount of $5 million.

¶ 39   On August 28, 2009, the City filed a posttrial motion for judgment *n.o.v.* again arguing that: (1) the plaintiff's claims were barred by section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)), which immunizes the City from any failure to initially install any traffic devices[11]; (2) the plaintiff's claim was barred by the exclusivity provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2006)); and (3) any claim by the plaintiff concerning the design of the preemption sequence or traffic control device was

[10]This instruction was given over the plaintiff's objection. The plaintiff proposed a far more comprehensive jury instruction with respect to the different theories of negligence, under which the jury could find in favor of the plaintiff. This jury instruction, however, was rejected by the circuit court in favor of the aforementioned three-theory negligence instruction. The reason for the circuit court's decision was the length of the plaintiff's proposed jury instruction, which spanned over two pages, with single-spaced typing. The circuit court believed that this instruction would be too confusing for the jury.

[11]In that respect, the City argued that the jury was instructed on the following three theories of negligence, namely that the City had: (1) failed to provide adequate warning signs at the intersection of 111th and Marshfield Streets; (2) failed to provide a traffic control system that prohibited a vehicle from turning right from Marshfield Street to 111th Street, including, but not limited to, a blank-out sign; and (3) allowed motorists to turn right from Marshfield onto 111th Street during the approach of a train. The City argued that all three theories were questions of law and fell squarely within the language of section 3-104 of the Tort Immunity Act, which immunizes the City from any failure to initially install any traffic control devices (745 ILCS 10/3-104 (West 2006)).

-12-

barred by the 10-year statute of repose (735 ILCS 5/13-214(b) (West 2006)).

¶ 40    In addition to responding to the City's judgment *n.o.v.* motion, on December 7, 2009, the plaintiff requested leave of court to file her third amended complaint seeking to add a dozen more specific alleged acts of negligence by the City (the same acts of negligence she had sought to include in her more comprehensive jury instruction).[12]

¶ 41    On August 26, 2011, this court affirmed the circuit court's judgment on the basis of the exclusivity provision of the Illinois Workers' Compensation Act (see 820 ILCS 305/5(a) (West 2006)). The plaintiff filed a petition for rehearing arguing that this issue should have been found waived. *Sexton v. City of Chicago*, 2011 IL App (1st) 100010-U. The plaintiff argued that the exclusivity provision of the Workers' Compensation Act (820 ILCS 305/5(a) (West 2006)) was an affirmative defense that ought to have been raised by the City in its initial pleadings, or, at the very least, in its initial motion for summary judgment, rather than, as it was, at the dawn of trial after the close of discovery. The plaintiff further argued that since no proper discovery was heard on this issue, its consideration on appeal and the disposition of the case on its basis was fundamentally unfair and prejudicial to her. After permitting the City to address these concerns, we were persuaded by the plaintiff's argument and subsequently granted her petition for rehearing. Accordingly, we consider the plaintiff's appeal once more.

¶ 42                                    II. ANALYSIS

¶ 43    We begin by noting that we review orders granting judgment *n.o.v.* under a *de novo* standard of review. *Harris v. Thompson*, 2012 IL 112525, ¶ 4 (citing *Evans v. Shannon*, 201 Ill. 2d 424, 427 (2002)); see also *Ries v. City of Chicago*, 242 Ill. 2d 205, 215 (2011). In doing so, we ask the same questions the circuit court asked in the first instance in

---

[12]These include, *inter alia*, the City's failure: (1) to maintain a traffic control system that prohibited vehicles from turning right when a train was approaching the crossing; (2) to warn, (3) regulate and/or (4) guide traffic in a manner that prohibited vehicles from turning right toward the railroad grade crossing when a train was approaching the crossing; (5) to place and maintain an advance warning, advising motorists that a railroad grade crossing was at or near the intersection on 111th and Marshfield Streets; (6) to place and maintain a blank-out sign prohibiting motorists from making a right turn toward the railroad grade crossing when a train was approaching the crossing; (7) generally to have adequate warning signs, lamps, whistles or bells at the crossing; (8) to properly coordinate traffic lights in conjunction with the crossing gate as required under section 11-304 of the Illinois Vehicle Code (625 ILCS 5/11-304 (West Supp. 2003)); (9) to have a proper functioning system to prevent vehicles from entering the grade crossing as a train is approaching; and (10) to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care by people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used. The plaintiff further alleged that the City was negligent because it: (1) specifically authorized and permitted motorists to make a right turn toward a railroad grade crossing when a train was approaching the crossing; and (2) maintained a traffic control system in such a manner that it specifically authorized and permitted motorists to make a right turn toward a railroad grade crossing even though a train was approaching.

determining whether to grant such a motion. *Harris*, 2012 IL 112525, ¶ 4; *Ries*, 242 Ill. 2d at 215; see also *Gaffney v. City of Chicago*, 302 Ill. App. 3d 41, 48 (1999). A motion for judgment *n.o.v.* may be granted only if all the evidence and inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favor the movant that no contrary verdict based upon the evidence could ever stand. *Harris*, 2012 IL 112525, ¶ 14 (citing *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967)); *Ries*, 242 Ill. 2d at 215; see also *Gaffney*, 302 Ill. App. 3d at 48.

¶ 44    On appeal, the plaintiff first contends that the circuit court erred when it found as a matter of law that the City was immunized from any negligence claim by section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)).

¶ 45    It is well accepted that the tort liability of municipalities is governed by the Tort Immunity Act (745 ILCS 10/1-101 *et seq.* (West 2006)). *West v. Kirkham*, 147 Ill. 2d 1, 6 (1992). This Act creates no new duties but merely codifies those existing at common law. *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006); see also *West*, 147 Ill. 2d at 14. " 'At common law, a municipality had a duty to maintain its property in a safe condition ***.' " *Judge*, 221 Ill. 2d at 215 (quoting *West*, 147 Ill. 2d at 14). This duty, however, did not extend to creating or erecting public improvements. *Judge*, 221 Ill. 2d at 215 (quoting *West*, 147 Ill. 2d at 14). Rather, only once the public improvement was actually constructed did the municipality have a duty to maintain it in a reasonably safe condition. *Judge*, 221 Ill. 2d at 215 (quoting *West*, 147 Ill. 2d at 14); accord *First National Bank in De Kalb v. City of Aurora*, 71 Ill. 2d 1, 11 (1978) ("This court has clearly established the rule that once a governmental unit 'adopts a plan in the making of public improvements,' it owes a duty to a plaintiff to maintain those improvements. [Citations.]").

¶ 46    The Tort Immunity Act "adopted the general principle that local governmental units are liable in tort." *Judge*, 221 Ill. 2d at 215. Under the current Act, a governmental unit must "exercise ordinary care to maintain its property in a reasonably safe condition." 745 ILCS 10/3-102(a) (West 2006).[13] The Act, however, limits "liability with an extensive list of immunities based on specific governmental functions." *Judge*, 221 Ill. 2d at 215.[14]

¶ 47    The relevant immunity provision here is section 3-104 of the Act, which states in pertinent part:

---

[13]We further note that section 11-304 of the Illinois Vehicle Code provides that, when placing traffic control devices, local authorities "shall" follow the Illinois manual. See 625 ILCS 5/11-304 (West 2006). This section "by mandating compliance with the Illinois Manual, establishes a defendant's duty of reasonable care." *Judge*, 221 Ill. 2d at 216 (citing *Snyder v. Curran Township*, 167 Ill. 2d 466, 472 (1995)).

[14]For example, section 3-103(a) (745 ILCS 10/3-103(a) (West 2006)) grants immunity for injury caused by a municipality's adoption of a plan or design for public improvement where that plan or design is approved by proper authority. Similarly, section 2-201 (745 ILCS 10/2-201 (West 2006)) provides that a "public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused."

-14-

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the *failure to initially provide* regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." (Emphasis added.) 745 ILCS 10/3-104 (West 2006).

¶ 48    In the present case, the City does not contest that it owed the plaintiff a duty of care. Rather, it contends that section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)) absolutely immunizes it from liability for breach of this duty. The City acknowledges that the statutory language of section 3-104 immunizes the failure to initially provide traffic devices, but not the negligent maintenance of those devices. See 745 ILCS 10/3-104 (West 2006). However, the City contends that by failing to install an advance warning sign or a blank-out sign that prohibited a vehicle from turning right from Marshfield to 111th Street, the City committed an immunized failure of initial traffic sign placement.

¶ 49    The plaintiff, on the other hand, argues that section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)) does not apply here because it immunizes a municipality only for its initial failures to install or place traffic devices. She contends that in the instant case, the City had already installed the traffic control system with the preemption sequence at the intersection of 111th Street and Marshfield Street (in 1994) and then negligently maintained it, ultimately resulting in Gerald's death. In support of this contention, the plaintiff points out that in 1996 the City made improvements to the intersection by installing a stop-here-on-red sign and stop line in front of the railroad tracks for eastbound traffic on 111th Street, but made no improvements on Marshfield to prohibit right turns onto the rail tracks when a train was approaching. The plaintiff further points out that as early as 1999, the City was aware that such improvements were necessary and recommended by IDOT to ensure safety of drivers turning right onto 111th Street but that it negligently failed to make those improvements. For the reasons that follow, we disagree with the plaintiff.

¶ 50    We begin by noting that in two decisions, *West*, 147 Ill. 2d at 10-12 and *Judge*, 221 Ill. 2d at 217-18, our supreme court has thoroughly addressed the scope of a municipality's immunity pursuant to section 3-104 of the Tort Immunity Act.

¶ 51    In *West*, the plaintiff collided with another vehicle in the process of making a left turn. *West*, 147 Ill. 2d at 3-4. The plaintiff sued the city of Urbana, claiming that the city had a duty to provide a left-turn arrow for her direction of traffic. *West*, 147 Ill. 2d at 10. The plaintiff argued, *inter alia*, that section 3-104's immunity for the failure to initially provide road markings did not apply in that case because the city had previously installed a left-turn arrow for traffic traveling in the opposite direction at the intersection where the accident occurred. *West*, 147 Ill. 2d at 10. Thus, the plaintiff argued that the city, having undertaken to provide left-turn devices for the intersection, had a duty to provide them symmetrically, and that its failure to do so constituted a nonimmunized improper placement. *West*, 147 Ill. 2d at 10. The appellate court agreed with the plaintiff, finding that "the City's 'partial regulation' of the intersection precluded the City from enjoying immunity under section 3-104." *West*, 147 Ill. 2d at 10.

¶ 52    On appeal, however, our supreme court rejected the plaintiff's argument and held:

"We find that the exception to section 3-104 urged by plaintiff and accepted by the appellate court is unwarranted and would effectively swallow the section's immunity entirely. The creative plaintiff, seeking to premise an action on the failure to provide a particular traffic device, could always circumvent section 3-104 by finding and pointing out some *other* traffic device that *was* provided. We do not believe that the legislature intended such a narrow construction of section 3-104 ***." (Emphasis in original.) *West*, 147 Ill. 2d at 10.

¶ 53    Our supreme court further explained that this interpretation of section 3-104 of the Tort Immunity Act "better serves" the expressed policy behind the Act, which is to protect local governmental units and employees from liability arising from "the operation of government." 745 ILCS 10/1–101.1 (West 2006). As the court reasoned:

"The 'operation of government' necessarily encompasses the policy decisions made by a municipality; that is, those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. The decision whether to install a traffic signal requires the municipal traffic planner to balance a host of competing interests, among them, safety, convenience and cost. *** [T]his is not the sort of decision that should be second-guessed by the courts. Were such second-guessing permitted, the traffic planner would be more concerned with avoiding possible litigation than with using his best judgment to properly balance the competing interests. Thus, instead of seeking the best balance of safety, convenience and cost, the traffic planner would concern himself only with whether it could later be argued that the regulation provided could have possibly been safer. Excessive regulation, with no corresponding gain in safety, convenience or cost efficiency, would be the natural result. The legislature recognized this by enacting section 3-104 and expressly immunizing the failure to provide a traffic control device or sign." *West*, 147 Ill. 2d at 11-12.

¶ 54    Subsequent to *West*, our supreme court revisited the scope of section 3-104 immunity in *Judge*. In that case, the plaintiff was injured as she was driving westbound on Galena Road, when she was struck head-on by a vehicle traveling eastbound and attempting to pass another vehicle by using the eastbound lane. *Judge*, 221 Ill. 2d at 201. At the time of the accident, the two-lane Galena Road had a broken yellow line dividing eastbound from westbound traffic. *Judge*, 221 Ill. 2d at 201. The driver of the vehicle that struck the plaintiff testified that he passed the eastbound vehicle ahead of him because he knew that a broken yellow line indicated that passing vehicles was permissible. *Judge*, 221 Ill. 2d at 201.

¶ 55    The record in *Judge* reflected that in 1978, the county assumed control over Galena Road, commissioning a preconstruction profile of the road and developing an improvement plan. *Judge*, 221 Ill. 2d at 201. That year, the county resurfaced the road and striped the center of the road with a broken yellow line, indicating that passing was permissible. *Judge*, 221 Ill. 2d at 201. The record further revealed that in 1978, the placement of the broken yellow line conformed with guidelines for adequate sight distances mandated by the MUTCD. *Judge*, 221 Ill. 2d at 201. This minimal sight distance standard, however, was changed and lowered

in 1984. *Judge*, 221 Ill. 2d at 201. When the county resurfaced Galena Road in 1993, prior to the plaintiff's accident, it restriped the center of the road with the same broken yellow line that it had placed in 1978, unaware that it no longer conformed to the MUTCD requirements. *Judge*, 221 Ill. 2d at 201.

¶ 56    Accordingly, after the accident, the plaintiff in *Judge* sued the county for negligence in maintaining the broken yellow line on Galena Road in contravention of the MUTCD requirements. The county argued that it was absolutely immune pursuant to section 3-104 of the Tort Immunity Act because by failing to paint a no-passing line on Galena Road, it essentially committed an immunized failure of initial placement.

¶ 57    The supreme court in *Judge* disagreed and held that section 3-104 immunity did not apply. In coming to this decision, the court in *Judge* first found that according to the MUTCD a broken yellow line is a "traffic control device," while a solid yellow line, by itself, is not, since "a one-direction no-passing zone requires both a broken yellow line and a solid yellow line, and a two-direction no-passing zone requires two solid yellow lines." *Judge*, 221 Ill. 2d at 217. Applying these definitions to the facts of that case, the court in *Judge* concluded that the 1993 restriping of Galena Road did not constitute an immunized failure to initially place a solid yellow line. *Judge*, 221 Ill. 2d at 217. Rather, the court found that the initial placement was made in 1978, when the county developed an improvement plan for Galena Road and resurfaced it, *i.e.*, improving the road with a traffic control marking, the two-direction passing zone. The court specifically held that pursuant to section 3-102(a) of the Tort Immunity Act (745 ILCS 10/3-102(a) (West 2006)), once the road was improved, the county had a duty to use ordinary care to maintain the road in a reasonably safe condition, so that when it resurfaced the road again in 1993, it had a duty to conform to the new MUTCD regulations and replace the two-direction passing zone with a no-passing zone. *Judge*, 221 Ill. 2d at 218. As the *Judge* court explained:

    "The question [here] is not whether the County initially installed the correct traffic control marking. Rather, the question is whether the County made any improvement to Galena Road, thereby undertaking the duty to maintain *that* improvement in a reasonably safe condition." (Emphasis omitted and added.) *Judge*, 221 Ill. 2d at 217.

¶ 58    In coming to its decision, the court in *Judge* recognized its prior holding in *West*, but then went on to distinguish that case on several grounds. *Judge*, 221 Ill. 2d at 220-21. First, the *Judge* court noted that unlike in *West*, where the plaintiff complained of the city's failure to install a no-left-turn-arrow where the intersection contained a no-right-turn arrow, this was not a case where a "creative plaintiff circumvents section 3-104 by pointing to some *other* traffic control device." (Emphasis in original.) *Judge*, 221 Ill. 2d at 220. Rather, as the *Judge* court noted, the County's mistake there "involve[d] the erroneous placement of *one* traffic signal, the centerline of Galena Road." (Emphasis added.) *Judge*, 221 Ill. 2d at 220.

¶ 59    In addition, the *Judge* court noted that unlike in *West*, the county's failure to correct the erroneous traffic control marking was not a result of the county's balancing " 'a host of competing interests, among them, safety, convenience and cost.' " *Judge*, 221 Ill. 2d at 220 (citing *West*, 147 Ill. 2d at 11). Rather, the county's failure to correct the erroneous traffic control marking was simply a negligent oversight and not the sort of decision immunized by

-17-

section 3-104. *Judge*, 221 Ill. 2d at 220. Accordingly, the *Judge* court concluded that " 'to hold the County liable in the instant case does not reflect the type of second-guessing that *West* prohibits.' [Citations.]" *Judge*, 221 Ill. 2d at 220-21.

¶ 60 Applying the decisions in *West* and *Judge* to the present case, for the reasons that follow, we are compelled to find that the City is immune pursuant to section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)). It is undisputed here that the City initially provided the traffic lights at the intersection of Marshfield and 111th Streets, and that these lights were connected to a preemption system that triggered the lights to act in a certain way upon the approach of a train. Under that preemption system, cars traveling east and west on 111th Street would receive a red light to prevent them from crossing the tracks when a train was approaching. Cars traveling southbound on Marshfield Street would receive a green light, so as to permit southbound Marshfield traffic, which is parallel to the tracks, to continue forward, and not back up traffic on the highway. Under *West*, had the City not installed any traffic lights at the intersection, it could not have been held liable for not posting them despite the dangerous intersection. *West*, 147 Ill. 2d at 11-12. Under *Judge*, once the decision to post the traffic lights was made, however, the City had a duty to maintain those lights with reasonable care. *Judge*, 221 Ill. 2d at 218. However, under *West*, the City had no duty to erect additional warning devices simply because it erected the traffic lights. *West*, 147 Ill. 2d at 11-12.

¶ 61 It is important to remember here that contrary to the plaintiff's repeated assertions of negligence in the City's maintenance of the "traffic control preemption system" at the intersection, the three theories of negligence under which this case actually proceeded to the jury were: (1) that the City failed to provide an "advance warning" sign near the intersection to warn traffic of the railroad crossing; (2) that the City failed to provide a traffic control system that prohibited a vehicle from turning right, including, but not limited to, a blank out sign; and (3) that the City's existing traffic control device created a hazard by "allowing" southbound motorists to make right turns when a train was approaching.

¶ 62 None of these three theories allege negligent maintenance, and all three fall squarely within the immunity of section 3-104. See 745 ILCS 10/3-104 (West 2006). The first two theories are both framed in terms of the City's "failure to provide" and, therefore, automatically trigger section 3-104. See 745 ILCS 10/3-104 (West 2006)); see also *West*, 147 Ill. 2d at 11-12. The third theory, regarding the City's existing traffic control device, similarly fails to allege negligent maintenance. As already noted above, the existing traffic control system did exactly what it was supposed to do; it stopped drivers heading east and west on 111th Street from crossing the railroad tracks upon the approach of a train and continued to route southbound traffic on Marshfield parallel to the train tracks so as to avoid traffic backing up on the highway. The plaintiff's claim that the existing system created a hazard by "allowing" right turns consciously avoids any discussion of how it might have disallowed them because the only way that the City could have disallowed right turns was to install some other sign or signal on southbound Marshfield Avenue. All the evidence presented at trial,

including the MUTCD regulations[15] and the plaintiff's own 1999 IDOT report concerning the intersection, recommended that the City install additional signs or devices on Marshfield Street in order to prohibit right turns toward the train tracks. These claims, however, are barred by section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)). See *West*, 147 Ill. 2d at 11-12.

¶ 63        The plaintiff attempts to argue that just as in *Judge*, the issue here is one of negligent maintenance because the City made improvements to the intersection when in 1996 it installed a new stop-here-on-red sign and stop line for eastbound traffic on 111th Street. The plaintiff, however, misconstrues *Judge*. In *Judge*, the court found that the county failed to maintain Galena Road in a reasonably safe condition when, by sheer oversight, it restriped the road with the same broken yellow line it had used before despite the new MUTCD standard, requiring a full yellow line to indicate a no-passing zone. *Judge*, 221 Ill. 2d at 217. The court in *Judge* distinguished *West* by noting that the public policy behind section 3-104 was not intended to protect such negligent oversights. As the *Judge* court explained:

"First, this is not a case where a creative plaintiff circumvents section 3-104 by pointing to some other traffic control device. Rather, the County's mistake in the present case involves the erroneous placement of one traffic signal, the centerline of Galena Road. Second, in the present case, the County's failure to correct the erroneous traffic control marking was not a result of the County's balancing 'a host of competing interests, among them, safety, convenience and cost.' *West*, 147 Ill. 2d at 11. Rather, the Illinois Manual states: ' "markings that are no longer applicable for roadway conditions or restrictions and that might cause confusion for the road user shall be removed or obliterated to be unidentifiable as a marking as soon as practical." ' [Citation.] Thus, the County's failure to correct the erroneous traffic control marking was simply a negligent oversight and not the sort of decision immunized by section 3-104. 'Because of the above distinctions, to hold the County liable in the instant case does not reflect the type of second-guessing that *West* prohibits.' [Citation.]." (Emphases omitted.) *Judge*, 221 Ill. 2d at 220-21.

¶ 64        Unlike in *Judge*, however, in the present case, there was no oversight on the part of the City when it installed signs on 111th Street but not on Marshfield Street. The record reveals that the City made a conscious decision not to add the blank-out sign on Marshfield Street because the City engineers concluded that such signs are never followed by drivers but merely act to confuse them. Specifically, in its June 22, 1999, letter, the City acknowledged its receipt of the IDOT report recommending modifications to the intersection, including the

---

[15]Section 8B.08 of the Illinois MUTCD states that "[a]t a signalized intersection that is located within 200 feet of a highway-rail grade crossing, measured from the edge of the track to the edge of the roadway, where the intersection traffic control signals are preempted by the approach of a train, all existing turning movements toward the highway rail grade crossing should be prohibited during the signal preemption sequence." Manual on Uniform Traffic Control Devices § 8B.08 (2009 ed.) To accomplish this goal, the MUTCD offers several options, including: (1) a blank-out or changeable message sign or (2) a traffic light with a steady red indication in combination with a "No Turn On Red" sign. See *id.*

installation of the no-right-turn blank-out sign, but then noted that it chose not to install any such or similar signs because they are "ignored by drivers," would confuse them, and would "contribute to the degradation of the driver's adherence to the necessary turn restrictions." Accordingly, unlike *Judge*, the situation here involves exactly the type of conscious municipal policy-making that *West* held section 3-104 is intended to protect. See *West*, 147 Ill. 2d at 11-12 ("The 'operation of government' necessarily encompasses the policy decisions made by a municipality; that is, those decisions which require the municipality to balance competing interests and to make a judgment call as to what solution will best serve each of those interests. The decision whether to install a traffic signal requires the municipal traffic planner to balance a host of competing interests, among them, safety, convenience and cost. *** [T]his is not the sort of decision that should be second-guessed by the courts. Were such second-guessing permitted, the traffic planner would be more concerned with avoiding possible litigation than with using his best judgment to properly balance the competing interests. Thus, instead of seeking the best balance of safety, convenience and cost, the traffic planner would concern himself only with whether it could later be argued that the regulation provided could have possibly been safer. Excessive regulation, with no corresponding gain in safety, convenience or cost efficiency, would be the natural result. The legislature recognized this by enacting section 3-104 and expressly immunizing the failure to provide a traffic control device or sign.").

¶ 65        Moreover, contrary to the plaintiff's assertion, *Judge* nowhere held that improvements to one traffic device necessarily require proper maintenance of another nearby traffic device. Rather, *Judge* only held that once an improvement is made *that same* improvement must be maintained in a reasonably safe condition. See *Judge*, 221 Ill. 2d at 217 (holding that "[t]he question [was] not whether the County initially installed the correct traffic control marking," but whether it "made any improvement to Galena Road, thereby undertaking the duty to maintain *that* improvement in a reasonably safe condition" (emphasis omitted and added)). Nothing, in *Judge*, however, suggests that once an improvement to one part of a road is made, the entire road, rather than the improvement itself, must be kept in a reasonably safe condition. In the present case, the City made no improvements to any of the traffic lights at the intersection. Nor did the City ever make any improvements at all to Marshfield Street. The only improvement the City ever made was to install a stop-here-on-red sign and stop line for eastbound traffic approaching the rail tracks on 111th Street. The presence of this sign (together with the stop line) does not trigger a duty to add a sign on Marshfield Street recommending no right turns. *West* makes this plainly clear. As our supreme court there explained:

> "The creative plaintiff, seeking to premise an action on the failure to provide a particular traffic device, could always circumvent section 3-104 by finding and pointing out some *other* traffic device that *was* provided. We do not believe that the legislature intended such a narrow construction of section 3-104 ***." (Emphases in original.) *West*, 147 Ill. 2d at 10.

¶ 66        The plaintiff also argues that section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)) should not apply to this case because the City "knew of the hazard posed to right-turning motorists during preemptions at this intersection and failed to *** correct it."

The plaintiff specifically contends that section 3-104 (745 ILCS 10/3-104 (West 2006)) does not apply because the City was put on notice by the 1999 IDOT report that improvements on Marshfield to prohibit right turns onto the rail tracks when a train was approaching were necessary to maintain safety for drivers making that right turn. For the reasons that follow, we disagree.

¶ 67        A very similar argument was raised and expressly rejected by our supreme court in *West*. There, just like here, the plaintiff argued that the "initial" failure to provide a device meant only that no liability should attach if the municipality was without notice that the lack of the device created a dangerous condition. *West*, 147 Ill. 2d at 7. The plaintiff in *West* specifically asserted that because the municipality in that case was aware of a prior injury at the same intersection, section 3-104 did not apply. *West*, 147 Ill. 2d at 7. The plaintiff contended that once a municipality was aware that the failure to provide a particular device had caused an injury, immunity no longer attached. *West*, 147 Ill. 2d at 7.

¶ 68        The supreme court outright rejected this contention. In doing so, the court looked to the plain language of the Tort Immunity Act as well as its legislative history, and concluded that the language of section 3-104 is "unconditional" and makes no reference to notice or lack of notice on the part of the governmental entity. *West*, 147 Ill. 2d at 7. As the court explained:

"[I]t is instructive to compare the language of section 3-104 to that of two other provisions in the Tort Immunity Act. Section 3-102(a) of the Act, which imposes a duty on municipalities to maintain public property in a safe condition, specifically states that the municipality will be immune from liability *unless* it had actual or constructive notice of the unsafe condition. [Citation.] Section 3-103(a) grants immunity for injury caused by a municipality's adoption of a plan or design for a public improvement where that plan or design is approved by the proper authority. That section goes on to specifically *exclude* from the scope of that immunity, those situations in which it *appears from the use of the plan or design* that an unsafe condition has been created. [Citation.] Thus, in those sections, the legislature, in clear and deliberate language, expressed its intent to *limit* those sections' immunity to situations where the municipality was *without notice* that it had created an unsafe condition. To the contrary, section 3-104 contains *no* language which expresses an intent to *limit* that section's immunity to situations in which the municipality was without notice that the lack of a particular device was unsafe. Furthermore, section 3-104 contains *no* language which indicates an intent to impose a duty on municipalities to provide a particular traffic control device where the municipality has notice that the failure to so provide has proved to be unsafe. Rather, section 3-104 clearly and unequivocally states that the municipality is *immune* from all liability arising out of the failure to provide a particular traffic control device." (Emphases in original and omitted.) *West*, 147 Ill. 2d at 7.

¶ 69        The court in *West* further looked to the legislative history of section 3-104, particularly the 1986 amendments to that section. *West*, 147 Ill. 2d at 8. The court specifically noted that the pre-1986 version of the statute permitted liability to attach to a governmental unit for failure to provide a traffic warning sign or device if such was "necessary to warn of a condition which endangered the safe movement of traffic." (Internal quotation marks omitted.) *West*, 147 Ill. 2d at 8. The court noted that when this section was amended in 1986,

the legislature chose to delete that language in its entirety. *West*, 147 Ill. 2d at 8. In addition, the legislature added "warning sign, device or marking" and "overhead lights, traffic separating or restraining devices or barriers" to the list of traffic devices a municipality was immunized for failing to provide. (Internal quotation marks omitted.) *West*, 147 Ill. 2d at 8. Based on these legislative changes, our supreme court in *West* concluded that "[t]he legislature *** clearly intended to enlarge the scope of section 3-104's immunity and to immunize *absolutely* the failure to initially provide a traffic control device, even where such failure might 'endanger the safe movement of traffic.' " (Emphasis in original.) *West*, 147 Ill. 2d at 8; see also *Wood v. Village of Grayslake*, 229 Ill. App. 3d 343, 354 (1992) ("*West *** holds that section 3-104 of the Tort Immunity Act absolutely immunizes a local public entity from failing to provide traffic control devices even if the governmental unit had notice of the hazardous condition of the roadway.").

¶ 70    Based on our supreme court's rationale in *West*, we too reject the plaintiff's contention here, that the City's section 3-104 immunity did not attach because the City was placed on notice about the hazard by the 1999 IDOT report. See *West*, 147 Ill. 2d at 8; *Wood*, 229 Ill. App. 3d at 354.

¶ 71    The plaintiff finally argues that the City cannot shield behind section 3-104 immunity because its failure to use advance warning or blank-out signs at the intersection of Marshfield and 111th Streets violated the requirements of the MUTCD and section 11-304 of the Illinois Vehicle Code (625 ILCS 5/11-304 (West 2008)).[16] Citing to *Snyder v. Curran Township*, 167 Ill. 2d 466 (1995), and *LoCoco v. XL Disposal Corp.*, 307 Ill. App. 3d 684 (1999), the plaintiff asserts that section 3-104 does not apply where the relevant state manual or regulation is violated. We disagree and find those cases inapposite.

¶ 72    We begin by pointing out that both *Snyder* and *LoCoco* involved governmental units asserting immunity pursuant to section 2-201 of the Tort Immunity Act, which specifically makes a distinction between discretionary and ministerial acts. See 745 ILCS 10/2-201 (West 2006) ("Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.").

¶ 73    In *Snyder*, the township installed a "curve" warning sign, but placed it on the wrong side of the road and only a short distance from the curve in contravention of the MUTCD's requirements. *Snyder*, 167 Ill. 2d at 468. The township asserted immunity pursuant to section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2006)), which immunizes discretionary but no ministerial acts. *Snyder*, 167 Ill. 2d at 468. *Snyder* held that ministerial

---

[16]Section 11-304 states in pertinent part:

"Local authorities *** shall place and maintain such traffic-control devices *** as are required to indicate and carry out the provisions of this Chapter, and local traffic ordinances or to regulate, warn or guide traffic. All such traffic control devices shall conform to the State Manual and Specifications ***.

Local authorities *** shall have the authority to install signs, in conformance with the State Manual and specifications ***." 625 ILCS 5/11-304 (West 2008)).

acts are those that do not call for the exercise of judgment or discretion, such as acts mandated by a statute. *Snyder*, 167 Ill. 2d at 468-69. The court then held that discretionary immunity applied to the township's initial decision whether to install the sign, but once the decision was made, the mere installation was a ministerial task and needed to be performed in accordance with applicable laws. *Snyder*, 167 Ill. 2d at 474-75.

¶ 74 In *LoCoco*, a city, county, and township entered into an agreement to install certain improvements at an intersection, including stop signs and corresponding painted stop bar lines. *LoCoco*, 307 Ill. App. 3d at 687. The township painted the stop bar lines for all four directions of traffic and had stop signs in place for traffic traveling along one of the streets (111th Street), but delayed in installing the stop signs on the busier route (Route 59). *LoCoco*, 307 Ill. App. 3d at 687. The location of the new stop bar lines on 111th Street also obstructed motorists' view of cross-traffic. *LoCoco*, 307 Ill. App. 3d at 697. The intersection had remained in this half-finished condition for about two weeks when the plaintiff was involved in a fatal accident there. *LoCoco*, 307 Ill. App. 3d at 697. The township asserted discretionary immunity.[17] *LoCoco*, 307 Ill. App. 3d at 697-98. The court in *LoCoco* explained that the installation of the stop signs was not discretionary because "once the parties established the intergovernmental agreement as a plan for the intersections' improvements and began the performance of the improvements, [the township's] discretionary function ended and its ministerial function began." *LoCoco*, 307 Ill. App. 3d at 698.

¶ 75 Unlike in *Snyder* and *LoCoco*, here the City never attempted to defend its actions pursuant to section 2-201 of the Tort Immunity Act (745 ILCS 10/2-201 (West 2006)) but, rather, asserted immunity solely pursuant to section 3-104 (745 ILCS 10/3-104 (West 2006)). Unlike section 2-201, nothing in section 3-104 calls for an analysis of whether a particular act or decision was discretionary or ministerial. See 745 ILCS 10/2-201, 3-104 (West 2006). In fact our supreme court has expressly held that it is improper to import the "discretionary/ministerial distinction" into sections of the Tort Immunity Act that do not specifically reference it. See *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 380 (1997). In *Epstein*, our supreme court pointed out that "the Tort Immunity Act *explicitly* preserves discretionary immunity *** [only] in two particular provisions, sections 2-109 and 2-201." (Emphasis in original.) *Epstein*, 178 Ill. 2d at 381. The court then went on to state:

"[C]ourts must not read conditions into the Tort Immunity Act that conflict with its plain language. [Citation.] Such an approach wrongly results in court-made limitations on what the legislature has prescribed in an area constitutionally designed as the legislature's own." *Epstein*, 178 Ill. 2d at 381.

¶ 76 What is more, our appellate courts have already considered and expressly rejected the same argument about *Snyder* that the plaintiff advances here in an attempt to avoid section 3-104. See *Boub v. Township of Wayne*, 291 Ill. App. 3d 713, 725 (1997) ("Plaintiff asserts that *Snyder* stands for the proposition that the immunity of section 3-104 does not apply if

---

[17]Although the court in *LoCoco* does not identify the specific immunity provision/section of the Act which the township asserted, its reference to "discretionary" immunity strongly suggests to it being section 2-201 (745 ILCS 10/2-201 (West 2006)).

the relevant state manual is violated. However, plaintiff's reliance on *Snyder* for this proposition is misplaced. In fact, citing *West* \*\*\*, with approval, the *Snyder* court noted that a local governmental entity has absolute immunity under section 3-104 for an 'initial failure to erect a traffic warning device.' [Citation.]").

¶ 77 Our courts have repeatedly held that "[w]hile section 11-304 of the Illinois Vehicle Code \*\*\* impose[s] [an] obligation[ ] upon municipalities to post various warning signs, section 3-104 of the Tort Immunity Act absolutely immunizes local public entities from any tort liability for failing to fulfil those duties." *Ramirez v. Village of River Grove*, 266 Ill. App. 3d 930, 933 (1994); accord *Robinson v. Atchison, Topeka & Santa Fe Ry. Co.*, 257 Ill. App. 3d 722, 775 (1994) ("The plaintiffs argue that the township is not immune because the [MUTCD] provides that railroad advance warning signs are mandatory on roadways in advance of every grade crossing. Neither the express language of section 3-104 nor the supreme court's interpretation of that section \*\*\* provides for an exception for mandatory warning signs."); *Gresham v. Kirby*, 229 Ill. App. 3d 952, 957 (1992) ("While section 11-304 of the Code imposes an obligation on local authorities to post warning signs \*\*\* section 3-104 of the Act immunizes local authorities from any tort liability for failing to fulfill this duty."); *Wood*, 229 Ill. App. 3d at 351 ("While [section 11-304] imposes an obligation on local authorities to warn motorists of those hazards incident to the portion of a highway remaining under local maintenance jurisdiction [citation], section 3-104 of the Tort Immunity Act immunizes a local public entity from any tort liability for failing to fulfill this duty."); *Fitt v. City of Mattoon*, 215 Ill. App. 3d 472, 481 (1991) ("While section 11-304 of the Code imposes an obligation on local authorities to post warning signs, section 3-104 of the Immunity Act immunizes local authorities from any tort liability for failing to fulfill this duty."); *Newsome v. Thompson*, 202 Ill. App. 3d 1074, 1079 (1990) ("Even assuming that \*\*\* the City's ordinances imposed a duty upon it to post barriers at its street reconstruction sites \*\*\* the Tort Immunity Act immunizes the City from liability for that negligence."). Accordingly, we reject the application of *Snyder* and *LoCoco* to the facts of this case.

¶ 78 For all of the aforementioned reasons, we conclude that under the present circumstances the City is absolutely immune pursuant to section 3-104 of the Act (745 ILCS 10/3-104 (West 2006)). See *West*, 147 Ill. 2d at 10; *Judge*, 221 Ill. 2d at 217-18; see, *e.g.*, *Ramirez*, 266 Ill. App. 3d at 932-33 (holding that a village was completely immune from prosecution pursuant to section 3-104 of the Tort Immunity Act for its failure to post the required warning signs reducing the speed limit in the area of a railroad crossing, the absence of which the plaintiff alleged caused his injuries); *Robinson*, 257 Ill. App. 3d at 775-76 (holding that a local township was absolutely immune under section 3-104 of the Tort Immunity Act for its failure to place a railroad advance warning sign on a road parallel to the railroad tracks, the absence of which the plaintiffs alleged caused their injuries); *Gresham v. Kirby*, 229 Ill. App. 3d at 957-58 (holding that pursuant to section 3-104, the town was immune from liability for failing to post warning signs on a town road just before an intersection with the state highway and for failing to close down the town road, even if this failure was negligent and caused the collision at the intersection that injured the plaintiff); *Boub*, 291 Ill. App. 3d at 724-26 (holding that a township was entitled to absolute immunity pursuant to section 3-104 of the Tort Immunity Act in a claim for negligence brought by a bicyclist who

-24-

was injured in an accident on a bridge because the township failed to place signs warning of the unimproved conditions during repair work on the bridge and that the road was closed to vehicular traffic during those repairs); see also *Wood*, 229 Ill. App. 3d at 354 ("*West* makes clear that immunity under section 3-104 applies to the failure to provide a specific traffic control device, even if the alleged hazard already has a different type of signal or sign." (Emphasis omitted)). Therefore, we conclude that the circuit court's grant of the City's motion for judgment *n.o.v.* on this basis was not made in error.

¶ 79 We further reject any attempt by the plaintiff to argue in the alternative that we should permit her to proceed with another trial because the circuit court erred in rejecting her request to modify her jury instructions or to allow her to file a third amended complaint "to conform to the proofs." In that respect, we first note that the plaintiff has waived this issue for purposes of appeal by failing to develop her argument properly. It is axiomatic that "[a] reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments" (*U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)), and that failure to develop an argument results in waiver. See, *e.g.*, *People ex rel. Madigan v. Lincoln, Ltd.*, 383 Ill. App. 3d 198, 208 (2008) (holding that a party waived the argument for purposes of appeal where it "merely state[d] [a] proposition and [made] no attempt to support it with analysis or authority"). Here, the plaintiff has failed to provide even the most basic analysis in support of her alternative request for a new trial. Rather, in one paragraph, the plaintiff asserts, with no citation to authority, that "to the extent the trial court's ruling granting JNOV is interpreted as being somehow based upon something lacking in the jury's charge or plaintiff's second amended complaint, plaintiff submits that the trial court abused its discretion in denying plaintiff to instruction [*sic*] the jury on the issues and evidence and denying leave to file her third amended complaint at law, and thus a new trial should be granted."

¶ 80 What is more, even if we were to review this issue, our review of the circuit court's determinations with respect to both jury instructions and leave to file an amended complaint is for abuse of discretion. See, *e.g.*, *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 44 (2010) (jury instructions); *O'Brien v. City of Chicago*, 285 Ill. App. 3d 864, 872 (1996) (amended complaint). Nothing in the record below suggests that the circuit court abused its discretion in limiting the jury instructions or denying the plaintiff's request to amend her complaint. See, *e.g.*, *Cetera*, 404 Ill. App. 3d at 44; see also *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274 (2002) (even where a jury instruction was incorrect a court will not order a new trial absent evidence of prejudice); see also *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 494 (1995) ("in order to allow the amendment of a pleading to conform to proof, the proof already produced must support the amendment"); *Canning v. Barton*, 264 Ill. App. 3d 952, 957 (1994) (holding that "[i]n the absence of any *** specific references to evidence in the record, [the reviewing court could] only conclude that the trial judge did not abuse his discretion in denying this motion [to amend the pleading]").

¶ 81                                                    III. CONCLUSION

¶ 82    For all of the aforementioned reasons, we affirm the circuit court's entry of judgment *n.o.v.* in favor of the City.

¶ 83    Affirmed.

¶ 84    JUSTICE HOWSE, dissenting.

¶ 85    I respectfully dissent.

¶ 86    The majority concluded that the City is immune from suit for the initial installation of the traffic control system pursuant to section 3-104 of the Tort Immunity Act (745 ILCS 10/3-104 (West 2006)), following our supreme court's decision in *West*, 147 Ill. 2d 1. However, the record indicates that the City had erected additional traffic control devices since its original installation and improved the traffic control system at the intersection where the decedent was killed. Therefore, I believe that the decision in *Judge*, 221 Ill. 2d 195, is more applicable.

¶ 87    The record establishes that a preemption traffic control system was installed in 1994 and was improved in 1996 with signage and placement of white lines near the railroad tracks. The record further reveals, as the majority noted, that in 1999 IDOT provided the City with a report concerning the regulation of the intersection where the decedent was killed, specifically recommending the installation of certain additional signs at the intersection. The City acknowledged receipt of the IDOT report, but consciously chose not to take the acts described and recommended by the report. Moreover, the MUTCD in 2000 and 2003 recommended that all turning movements toward railroad tracks be prohibited during signal preemption and plaintiff's expert testified that the MUTCD is a national standard for traffic devices, adopted by both the federal government and the state of Illinois. Section 11-304 of the Illinois Vehicle Code (625 ILCS 5/11-304 (West 2004)) provides that, when placing traffic control devices, local authorities shall follow the Illinois Manual. See *Judge*, 221 Ill. 2d at 217.

¶ 88    "The traditional common law duty of local governments concerning public property is a duty to maintain that property in a reasonably safe condition." *Horrell v. City of Chicago*, 145 Ill. App. 3d 428, 432 (1986). "The duty is only to 'maintain' the property and does not require the creation of public improvements." *Horrell*, 145 Ill. App. 3d at 432. This is codified in section 3-102 of the Act. 745 ILCS 10/3-102 (West 2008). "Thus, the duty to maintain does not commence until an improvement is actually undertaken." *Horrell*, 145 Ill. App. 3d at 432.

¶ 89    While a city is not liable for its failure initially to provide improvements such as lights or traffic control devices, once having adopted and embarked upon a plan of public improvements, a city has a duty to maintain those improvements in a condition conducive to the safety of the traveling public. *Santelli v. City of Chicago*, 222 Ill. App. 3d 862, 867 (1991). Moreover, section 11-304 of the Vehicle Code (625 ILCS 5/11-304 (West 2004)), which mandates compliance with the Illinois MUTCD, establishes a defendant's duty of reasonable care. *Judge*, 221 Ill. 2d at 216 (citing *Snyder v. Curran Township*, 167 Ill. 2d 466, 472 (1995)).

¶ 90    Here, it is uncontested that the signal preemption mechanism at the intersection where decedent was killed did not prohibit turns toward the railroad tracks despite the MUTCD recommendation that all turning movements toward railroad tracks be prohibited during signal preemption. Additionally, as the record indicates that improvements were made to the traffic control system at that location, namely, by adding signage and painted lines, the City had a duty to maintain those improvements safely for the traveling public. Thus, despite the majority's contention to the contrary, it is unreasonable to conclude that the City had immunity based on an initial installation when the evidence clearly establishes subsequent improvements to the intersection. The plain language of section 3-104 immunizes only the failure to initially provide traffic control devices. *Judge*, 221 Ill. 2d at 217-18.

¶ 91    Further, in the case at bar, the evidence established that the MUTCD regulations required the installation of traffic control devices that would prevent turns toward railroad tracks. The majority found that the City is immune for its noncompliance with the MUTCD and failure to install because of its discretionary determination that such signage would be ignored by drivers and confuse them. However, our supreme court has determined that the placement of traffic control devices outside of the statutory requirements is a ministerial act. *Snyder*, 167 Ill. 2d at 474.

¶ 92    The common law recognized the distinction between discretionary duties, the negligent performance of which does not subject a municipality to tort liability, and ministerial duties, the negligent performance of which can subject a municipality to tort liability. *Snyder*, 167 Ill. 2d at 473. Although discretionary immunity has been codified in section 2-201 of the Immunity Act (745 ILCS 10/2-201 (West 2004)), cases considering duty under the Vehicle Code have continued to use the common law definitions of discretionary and ministerial functions. *Snyder*, 167 Ill. 2d at 473. Generally, discretionary acts are those which are unique to the particular public office and not merely ministerial in nature, while ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act. *Snyder*, 167 Ill. 2d at 474; *Parsons v. Carbondale Township*, 217 Ill. App. 3d 637, 644 (1991). Here, where statutory and regulatory guidelines were in place, the City's conscious decision not to comply with the MUTCD guidelines was ministerial, not discretionary, and violated its duty of reasonable care to the traveling public. See *Snyder*, 167 Ill. 2d at 474.

¶ 93    Accordingly, I would reverse the circuit court's grant of judgment *n.o.v.* and reinstate the jury's verdict.