# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Warning v. City of Joliet, 2012 IL App (3d) 110309**

---

| | |
|---|---|
| Appellate Court Caption | KRISTINE WARNING, as Independent Executor of the Estate of Joanne M. Warning, Deceased, Plaintiff-Appellant, v. THE CITY OF JOLIET, a Municipal Corporation, Defendant-Appellee (Amanda M. Ibarra, Defendant). |
| District & No. | Third District<br>Docket No. 3-11-0309 |
| Filed | August 22, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A verdict was properly directed for defendant city in an action for the fatal injuries suffered by plaintiff's decedent when she was struck by a vehicle while crossing a street inside a crosswalk, since the city had no duty of reasonable care with regard to the lighting and crosswalks at the scene, and there was no evidence the city had actual or constructive notice that the streetlights were not operating or that it failed to make a reasonable inspection or failed to erect additional signs. |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 06-L-650; the Hon. Barbara Petrungaro, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Andrew A. Muchoney (argued), of McKeown Fitzgerald Zollner Buck Hutchison & Ruttle, of Joliet, for appellant. |
| | |
| | John P. Wise (argued), Assistant Corporation Counsel, of Joliet, for appellee. |
| | |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion. Presiding Justice Schmidt and Justice Carter concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Kristine Warning, as independent executor of the estate of Joanne M. Warning, filed an action against defendant, City of Joliet (City), to recover damages for personal injuries her mother sustained when she was struck by a vehicle while crossing the street inside a crosswalk. Following plaintiff's case-in-chief, the trial court entered a directed finding in favor of the City. On appeal, plaintiff claims that the trial court erred in finding (1) that the City did not owe a duty of reasonable care relating to street lighting and crosswalks on Madison Street, (2) that no evidence was presented as to actual or constructive notice that certain streetlights were inoperable, and (3) that no evidence was presented that the City failed to make a reasonable inspection of the crosswalk or failed to erect additional signage around the crosswalk. We affirm.

¶ 2    Plaintiff filed a complaint against the City alleging that it was liable for injuries Joanne, age 79, suffered when she was struck by a vehicle driven by Amanda Ibarra on Madison Street outside Provena Hospital on September 5, 2005. Joanne died from the injuries a few weeks later. Plaintiff alleged that her mother's death was the result of the City's negligence. Specifically, the complaint alleged that the City failed to (1) maintain the streetlamps on Madison Street, (2) warn of the inoperative streetlamps near the crosswalk, (3) make a reasonable inspection of the crosswalk, and (4) have or follow procedures for the inspection of streetlamps at crosswalks.

¶ 3    At the bench trial, Jesse Harper testified that he was employed by Provena as a full-time security officer from May of 2005 through September or October of 2007. His job was to ensure the safety of the employees and visitors of the hospital. He observed the roadways and lighting around Provena. From June or July 2005 through September 2005, he noticed several inoperable streetlights on Madison Street. Typically, during that time, he noted about one per week. When he found a streetlight that was out, he would mark the inoperable light with yellow caution tape. He testified that the light at the parking lot on the east side of Madison Street was out the night of the accident and prior to the accident, but he did not

know for how long.

¶ 4      Harper testified that it was not his responsibility to tell the City that the lights were out. He simply reported them to his supervisor. He was not aware of any reports made to the City about streetlights at the parking lot on Madison.

¶ 5      On September 5, 2005, he remembered a woman being struck in the crosswalk. He did not see the accident but he heard the screeching brakes. Harper went to the crosswalk and saw Joanne on the ground in front of a vehicle. He testified that it was dark outside at the time of the accident and that he did not look specifically at the streetlights.

¶ 6      Amanda Ibarra testified that she works as a nurse at Provena. On September 5, 2005, she worked until 2:30 p.m. and then stayed beyond her shift. She worked more than 14 hours that day. She left the employee parking lot on the Madison Street side that evening. The road was dry, and it was dark out. The lights on her car automatically turned on. She was able to see the roadway when she pulled out. Before entering the crosswalk on Madison, she slowed down, but she hit a pedestrian. Although she applied her brakes as soon as she saw the woman, it was too late. The woman was walking in her lane of traffic and was wearing dark clothing. Ibarra testified that she believed the lighting affected her ability to see the woman.

¶ 7      Prior to September 5, 2005, she had no knowledge of any streetlights out on Madison Street. The crosswalk was illuminated that evening, but she did not know if the light was on the crosswalk or how the crosswalk was lit.

¶ 8      Officer Shana Murnane testified that there are no policies at the City police department as to reporting streetlight outages. Officers could report streetlight outages if they see them, but there are no written policies.

¶ 9      As part of her job, Murnane reconstructs accident scenes. On September 5, 2005, she investigated the crosswalk on Madison Street. The roadway had average nighttime lighting. Although there were streetlights in the area, the streetlight on the east side of the street, approximately 80 feet to the south of the crosswalk, was not operational. There was no yellow caution tape tied around the pole. There was another operational street light 100 feet to the north of the crosswalk. There was also ambient lighting from the moon, parking lot and the entrance to the hospital.

¶ 10      Officer Michael Rouse testified that there was no policy in 2005 for the police officers to report streetlight outages or hazardous road conditions. On September 5, 2005, he reported to the scene of the accident in front of the hospital. Officer Rouse was the lead reconstructionist, and it was his responsibility to gather evidence at the scene. He noticed that a streetlight was out to the south of the crosswalk. He testified that the Joliet police department tied yellow tape around the pole of that light. No other markings were on the pole at that time. He did not know if the light was out at the time of the accident. He also noted that there was other ambient lighting, including a smaller light pole at the other end of the crosswalk in the hospital's driveway. Although the diagram of the scene showed a streetlight directly above the crosswalk, that was an error. There are no lights directly over the crosswalk. There is a streetlight 100 feet to the north of the crosswalk. There is also another streetlight to the south, but Officer Rouse did not know how far away it was.

¶ 11      Dennis Mulcahy testified that he has been a security officer for the hospital for 7½ years.

-3-

He patrols the parking lots and the hospital building nearby. He is responsible for patrolling Madison Street, including the crosswalk and the visitor's parking lot. Prior to September 5, 2005, he observed streetlight outages around Provena. He saw several streetlights out on Madison Street in 2005.

¶ 12    On September 5, 2005, he heard a thud and screeching tires and turned to see a woman lying in the street with a car in the crosswalk. Mulcahy testified that he believed some streetlights were out that night and that some streetlights had not been working for some time, but he did not know which lights were out or how long they had been out before the accident. Mulcahy never called the City regarding streetlight outages, and he did not recall if he ever informed anyone on the date of the accident that there were streetlights out on Madison Street. He did not prepare any written report.

¶ 13    Clarke Corcoran works at Provena. On September 13, 2002, he sent a letter to the City regarding complaints that the hospital's safety committee had received about the crosswalk on Madison Street. Specifically, the letter referred to problems with traffic refusing to slow down for people within the crosswalk. The letter did not refer to any problem with lighting.

¶ 14    Karen Plyman is employed with the City of Joliet as an information service technician. She oversees the mail room and processes citizen complaints. If she receives a call of a streetlight outage, she faxes it either to ComEd or the City public works, depending on the location and type of pole. If she receives a complaint about streetlight outages of lights on wooden poles, she refers it to ComEd because ComEd maintains the wooden poles.

¶ 15    The City keeps a log of outages. Plyman reviewed the file from 2000 to 2005 and did not find any complaint of a streetlight outage or malfunctioning streetlight on Madison Street near the hospital during the time of the accident.

¶ 16    Russell Lubash testified that he is the traffic engineer for the City and has been for the past six or seven years. He is responsible for traffic-related engineering projects, including the maintenance of streetlights and traffic signals. Street lighting design depends on the project and the road classification, as well as City standards for spacing streetlights. The City guidelines require that streetlights be placed 250 feet apart.

¶ 17    Lubash maintains a log of complaints regarding streetlights and poles. If he receives a complaint, he reports it to the electrical department. The City keeps a log of all complaints and forwards those that do not involve City poles to ComEd. Once a month, electricians turn on the cabinets to the streetlights and perform routine maintenance.

¶ 18    Lubash stated that the streetlight in question was probably installed in the 1960s when the hospital was built. The streetlight is maintained on a wooden pole and owned by ComEd. Lubash further testified that neither the Manual of Uniform Traffic Control Devices (MUTCD) nor the American National Standards Institute requires periodic studies to be conducted concerning streetlights on roadways after they are installed. Lubash noted that the Illuminating Engineering Society of North America (IESNA) publishes recommended practices for streetlights. However, the IESNA recommendations pertain only to new streetlight system installations and do not apply to old ones.

¶ 19    Lubash further testified that for a marked crosswalk, the MUTCD requires that the walkway be outlined from one location to the other with six-inch-thick white striping. The

Madison Street crosswalk was restriped in 2004. At that time, the City adopted the option to improve the crosswalk by painting large parallel bar markings in the direction of traffic across the entire roadway. The stripes were painted 12 inches thick. This option was adopted above the MUTCD requirement to provide greater visibility.

¶ 20	Lubash stated that the crosswalk sign at the scene of the accident meets the MUTCD standards. Although the guidelines are reviewed and revised periodically, the MUTCD does not require the replacement of a noncompliant sign to current standards if the sign previously met the basic installation standards. Lubash testified that the crosswalk signage in this case met the installation standards under the MUTCD at the time it was installed. Whether to modify the crosswalk to include a downward pointing arrow as required in the updated MUTCD standards, which were revised after the crosswalk was installed, was based on his judgment and the visibility of the current crosswalk.

¶ 21	Following plaintiff's case-in-chief, the City moved for a directed finding. The trial court concluded that the plaintiff failed to present sufficient evidence to sustain her burden of proof and entered judgment in favor of the City.

¶ 22	                                        I

¶ 23	When ruling on a motion for a directed finding, the trial court must employ a two-step analysis. First, the court must determine as a matter of law whether the plaintiff has presented a *prima facie* case. *Law Offices of Colleen M. McLaughlin v. First Star Financial Corp.*, 2011 IL App (1st) 101849. A plaintiff presents a *prima facie* case when he or she presents some evidence on each element essential to the cause of action. *Minch v. George*, 395 Ill. App. 3d 390 (2009). Second, if the plaintiff has presented some evidence on each element, the court then must consider and weigh the totality of the evidence presented. *Law Offices of Colleen M. McLaughlin*, 2011 IL App (1st) 101849, ¶ 39.

¶ 24	If the trial court finds that the plaintiff has failed to establish a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *Minch*, 395 Ill. App. 3d at 398. However, if the trial court moves on to consider the weight and quality of the evidence and finds that no *prima facie* case remains, the appellate standard of review is manifest weight of the evidence. *Gorski v. Board of Fire & Police Commissioners*, 2011 IL App (2d) 100808. A decision is against the manifest weight of the evidence if the opposite conclusion is clearly apparent. *Id.* ¶ 34.

¶ 25	                                        II

¶ 26	Plaintiff first argues that she presented a *prima facie* case that the City had a duty to maintain the streetlights on Madison Street.

¶ 27	A municipality has a common law duty to maintain its property in a reasonably safe condition. *Swett v. Village of Algonquin*, 169 Ill. App. 3d 78 (1988). That duty has been codified in section 3-102(a) of the Illinois Local Governmental and Governmental Employees Tort Immunity Act, which provides:

"Except as otherwise provided in this Article, a local public entity has the duty to

-5-

exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102(a) (West 2006).

¶ 28    However, a municipality's duty to maintain public property does not apply to streets or other property it does not own. *Janssen v. City of Springfield*, 79 Ill. 2d 435 (1980). Moreover, a city has no common law duty to light its streets. See 19 Beth A. Buday *et al.*, McQuillin on Municipal Corporations § 54.101 (3d rev. ed. 1994); see generally *Greene v. City of Chicago*, 73 Ill. 2d 100 (1978); *Horneyer v. City of Springfield*, 98 S.W.3d 637 (Mo. Ct. App. 2003). A municipality's duty to provide streetlights is limited to situations in which illumination is necessary to avoid dangerous and potentially hazardous conditions. *Thompson v. City of New York*, 585 N.E.2d 819, 820 (N.Y. 1991). An intersection that is large and busy does not qualify, in and of itself, as a dangerous or potentially hazardous condition (*Thompson*, 585 N.E.2d at 820), and the mere outage of streetlights at an intersection does not render a reasonably safe street dangerous (*Horneyer*, 98 S.W.3d at 645). Nevertheless, where a city undertakes to provide streetlights, it is liable if it does so in an insufficient or inadequate manner. *Greene*, 73 Ill. 2d at 108-09.

¶ 29    Here, the evidence demonstrated that the City did not own the streetlight located 80 feet from the crosswalk. Lubash, the city traffic engineer, testified that the lights on Madison Street were owned and maintained by ComEd. As a result, any complaint the City received of an inoperable light on Madison Street was forwarded to ComEd. Moreover, the testimony at trial showed that the City had not undertaken to provide a streetlight to illuminate the crosswalk in front of Provena. Lubash testified that the streetlight in question was installed when the hospital was built and that the purpose of the streetlight was to illuminate the roadway, not the crosswalk. Based on these undisputed facts, the trial court properly concluded that the City did not have a duty to maintain the streetlights on Madison Street.

¶ 30                                                    III

¶ 31    Plaintiff claims that the trial court erred in finding that there was no actual or constructive notice given to the City that a streetlight on Madison Street was inoperable until after the accident.

¶ 32    Plaintiff is correct that sufficient notice of a dangerous condition may give rise to a breach of duty by the defendant if the condition is left uncorrected. See *Cochran v. George Sollitt Construction Co.*, 358 Ill. App. 3d 865 (2005). However, under the facts of this case, actual notice can only be established by showing that someone reported the unilluminated streetlamp to the City. No facts exist demonstrating such notice. Plyman testified that the City maintains a log of outages. She reviewed the file from 2005 and did not find any complaints regarding streetlight outages or malfunctions on Madison Street in front of the hospital. Lubash testified that he also maintains a log of streetlight complaints. He reviewed

his log for 2004 through 2005 and did not find any complaints of a streetlamp outage on Madison near the area of the accident. Plaintiff's claim that the correspondence of Clarke Corcoran provided actual notice of inoperative streetlights on Madison Street also fails. The letter stated concerns that motorists were not watching for pedestrian traffic and would not slow down. It did not mention poor lighting, streetlights or illumination issues. In addition, although Harper testified that he frequently noticed streetlight outages on Madison, he admitted that he never notified the City. The record demonstrates that plaintiff failed to present sufficient evidence that the City had actual notice that the light near the crosswalk was inoperable at the time of the accident.

¶ 33    Plaintiff argues that the record supports an inference of constructive notice on the part of the City. We disagree. Constructive notice can only be established where the dangerous condition is shown to exist for a sufficient length of time to impute knowledge of its existence to the defendant. *Pavlik v. Wal-Mart Stores, Inc.*, 323 Ill. App. 3d 1060 (2001). Here, there are no facts that show the length of time the streetlight was out. While plaintiff claims that the light had been inoperable for several days before the accident, nothing in the record supports that claim. Harper testified that he noticed the streetlamp south of the crosswalk had not been working in the past. However, he could not say whether it was illuminated at the time of the accident. Without further corroboration, his testimony fails to establish constructive notice. See *City of Ottawa v. Hayne*, 114 Ill. App. 21 (1904) (constructive notice demonstrated by duration, location and conspicuousness of the hazard).

¶ 34                                                              IV

¶ 35    Plaintiff also claims that the City failed to make a reasonable inspection of the crosswalk.

¶ 36    A municipality owes a duty of reasonable care to pedestrians who walk in a street inside of or within the boundaries of a crosswalk. *Ramirez v. City of Chicago*, 212 Ill. App. 3d 751 (1991).

¶ 37    Lubash testified that the crosswalk was restriped in 2004. The crosswalk was repainted to include parallel bar markings to the traffic that were 12 inches wide, rather than the required 6 inches. Lubash also stated that the new striping exceeded MUTCD standards and provided greater visibility. Plaintiff failed to present any evidence that contradicted the city engineer's position. Thus, the evidence at trial demonstrated that the City inspected the crosswalk and made adequate improvements. The trial court's finding that the City made a reasonable inspection of the crosswalk was not error.

¶ 38                                                              V

¶ 39    Last, plaintiff argues that the trial court erred in finding that there was "no evidence" that the City violated any duty by its installation or maintenance of the crosswalk or that the City had a duty to erect additional signage around the crosswalk.

¶ 40    In her case-in-chief, plaintiff failed to show that the City violated its duty to install and maintain the crosswalk in a reasonably safe manner. The uncontested evidence established that the City's initial crosswalk installation met the recommended guidelines. Under the

MUTCD, the crosswalk sign present at the time of the accident met the installation standards because, as Lubash testified, it met the standards that existed at the time it was initially installed. Plaintiff argued below that the crosswalk should have included a downward arrow painted on the roadway, but she failed to show that the City was required to provide such signage or that the crosswalk failed to meet the standards at the time it was installed.

¶ 41    Plaintiff attempts to bolster her argument that the City was negligent in failing to erect additional signage and failing to properly maintain the crosswalk by asserting that the trial court erred in refusing to allow her expert, Joseph Regis, to testify. A trial court is granted considerable discretion in ruling on matters of discovery. *City of Chicago v. St. John's United Church of Christ*, 404 Ill. App. 3d 505 (2010). Nevertheless, the purpose of discovery is not to punish the offending party. See *Besco v. Henslee, Monek & Henslee*, 297 Ill. App. 3d 778 (1998). An objection based upon timeliness of disclosure of an expert witness must be weighed in context with (1) surprise to the adverse party, (2) prejudicial effect, (3) nature of the expert's testimony, (4) diligence of the adverse party, (5) whether the objection was timely, and (6) the good faith of the party calling the witness. *Id.* at 783.

¶ 42    Here, plaintiff sought to disclose Regis as an expert witness three weeks before the September 30, 2010, trial date. However, plaintiff failed to disclose Regis as a controlled expert witness in its answer to Supreme Court Rule 213(f) interrogatories filed in August of 2009. See Ill. S. Ct. R. 213(f) (eff. July 1, 2001). In addition, plaintiff did not provide the conclusions or opinions of Regis and failed to disclose any reports prepared by him. Instead, plaintiff filed an emergency motion for leave to supplement discovery days before trial and attached a September 2002 memorandum from Clarke Corcoran to Dennis Duffield in support of the expert's opinion. Plaintiff failed to act diligently in her disclosure of this witnesses. Based on the untimeliness of her request, her failure to abide by Supreme Court Rule 213(f), and her failure to disclose appropriate records in support of the expert, the trial court's decision to deny her motion was not an abuse of discretion.

¶ 43    Based on the record before us, we find no error in the trial court's ruling that plaintiff failed to sustain her burden of proof as to negligence or that the City was entitled to a directed verdict.

¶ 44                                    CONCLUSION
¶ 45    The judgment of the circuit court of Will County is affirmed.

¶ 46    Affirmed.