**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230381-U

Order filed December 6, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| CHHAYA MANKAME, Independent Executor of the ESTATE OF RAMDAS MANKAME, deceased, | ) ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellant, | ) ) | Appeal No. 3-23-0381 Circuit No. 21-L-916 |
| v. | ) ) ) | |
| BLOOMINGDALE TOWNSHIP, VILLAGE OF BLOOMINGDALE, and JASMINE SANCHEZ, | ) ) ) ) | |
| Defendants, | ) ) ) | Honorable |
| (Bloomingdale Township and Village of Bloomingdale, Defendants-Appellees.) | ) ) | Timothy J. McJoynt, Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  We affirm the trial court's dismissal of plaintiff's negligence action against the municipal defendants because section 3-104 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/3-104 (West 2020)) provided absolute immunity against her claims.

¶ 2    Plaintiff, Chhaya Mankame, acting as an independent executor of the Estate of Ramdas Mankame, filed a complaint under the Wrongful Death and Survival Acts against municipal defendants, Bloomingdale Township (the Township) and the Village of Bloomingdale (the Village).[1] Plaintiff alleged in the operative complaint that the municipal defendants had been negligent and willful and wanton when they designed a bike trail that was hazardous and that they failed to mitigate the danger after other persons had been injured. The municipal defendants moved to dismiss pursuant to section 2-619.1 of the Code of Civil Procedure (Code). 735 ILCS 5/2-619.1 (West 2020) (allowing combined motions to dismiss under sections 2-615 and 2-619). Under section 2-615, they argued that plaintiff did not plead sufficient facts to support a claim under section 3-103(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Act). 745 ILCS 10/3-103(a) (West 2020) ("Adoption of plan or design of improvement of property"). Under section 2-619(a)(9), they argued that, even if plaintiff did allege sufficient facts, plaintiff's claim was dependent upon the initial failure to provide a traffic control device and, thus, section 3-104 of the Act provided absolute immunity against it. *Id*. § 3-104 (West 2020) ("Failure to provide traffic signals and signs"). Also under section 2-619(a)(9), the Village argued that it could not be liable under section 3-103(a) because it did not own the intersection where the accident occurred. *Id*. § 3-103(a) (West 2020). The trial court granted the motions to dismiss, agreeing with both section 2-619(a)(9) arguments. 735 ILCS 5/2-619(a)(9) (West 2020). It found that the section 2-615 portion of the motions was "moot." *Id*. § 2-615. Plaintiff appeals and, for the reasons that follow, we affirm.

---

[1] Plaintiff also filed a negligence claim against Jasmine Sanchez, the motorist who struck Ramdas on his bicycle. That lawsuit remains pending but is not relevant to this appeal.

I. BACKGROUND

¶ 4          On September 4, 2020, Ramdas was fatally injured while riding his bicycle on the North

Central DuPage Regional Trail (trail).  The trail is a 19-mile-long, multi-jurisdictional bicycle

route.  Some portions of the trail run "off-street" through forest preserves and paths, while other

portions of the trail run "on-road" over existing roads shared with motor vehicles.  A 1.5-mile

portion of the trail is at issue here.  It connects the Mallard Lake Forest Preserve to Springfield

Park, in a straight path avoiding passage along what plaintiff elsewhere terms "arterial roads" such

as Lake Street.  The trail goes "off-street" over a wetland boardwalk and "on-road" over Lawrence

Avenue.  The accident occurred mid-route "on-road" at the intersection of Lawrence and Garden

Avenue (the intersection).  The following image of the intersection was attached to the Village's

motion to dismiss.



¶ 5    The intersection may be thought of as a lower-case "t," with each arm representing one block, with a vehicular entrance on the northern point at Lake Street, and pedestrian/cyclist-only entrances on the western, southern, and eastern points. The intersection did not have, and never had, a warning sign and/or traffic control device. Ramdas exited the wetland boardwalk and cycled east on Lawrence. The motorist departed from the dead-end, southern block of Garden and traveled north. As pled in the operative complaint, "signs were placed on Lawrence Avenue for eastbound bikes emerging from the aforesaid 'off[-]street' portion of trail that were now on the 'on-road' portion of the trail, including a warning regarding a 'hidden driveway.' " Continuing east after these signs, Lawrence began to slope downhill. The distance from the top of the slope to the intersection was 328 feet. Over that distance, the change in elevation was 13 feet.

¶ 6                                    A. Initial Pleadings

¶ 7    Relevant here, on January 11, 2022, plaintiff filed a first amended complaint against the municipal defendants. Plaintiff alleged, *inter alia*, that "[t]he fact that the [trail] transitioned from 'off[-]street' to 'on-road' and into a downhill slope towards an *unprotected intersection* without any traffic control was a hazard." (Emphasis added.) Plaintiff alleged that the municipal defendants were negligent and/or willful and wanton when they:

> "a. Despite being made aware of the danger by virtue of the fact that another biker had been hit in the same intersection in a similar fashion earlier in 2020, failed to place, provide, and/or maintain appropriate warning signs along the [trail] and/or Lawrence Avenue that would warn of the hazard presented by the transition from the 'off[-]street' portion of the [trail] to the 'on-road' portion of the [trail], downhill into the unprotected intersection; or

4

b. Constructed and/or created a condition pursuant to a plan and/or design that was hazardous, as described above, that was not reasonably safe and failed to mitigate the condition when it appeared from its use that it was not reasonably safe, and failed to address the danger after other persons were injured in a similar manner as the decedent."

¶ 8    The municipal defendants moved to dismiss pursuant to section 2-619 of the Code, arguing that section 3-104 of the Act provided them with absolute immunity against plaintiff's claims in that each of plaintiff's claims depended on an initial failure to install warning signs and/or traffic control devices. The trial court agreed, granting plaintiff leave to replead in a manner that did not implicate section 3-104 of the Act.

¶ 9    On August 15, 2022, plaintiff filed a second amended complaint. In it, plaintiff removed what had been paragraph "a" in the first amended complaint and all references to the absence of warning signs and traffic control devices. Plaintiff instead alleged that merely having bicyclists ride down a hill toward an intersection was hazardous. Plaintiff repleaded what had been paragraph "b" in the first amended complaint, again claiming that the municipal defendants were negligent and/or willful and wanton in that they:

"Constructed and/or created a condition pursuant to a plan and/or design that was hazardous, as described above, that was not reasonably safe and failed to mitigate the condition when it appeared from its use that it was not reasonably safe and failed to address the danger after other persons were injured in a similar manner as the decedent."

¶ 10    The municipal defendants moved to dismiss pursuant to section 2-615 of the Code, arguing that plaintiff's chief factual allegation—that a road that sloped toward an intersection was a hazard—was a conclusion rather than a fact. In removing the allegation that the municipal defendants failed to install a warning sign and/or traffic control, plaintiff left no facts which, if

5

true, supported her assertion that the portion of the trail at issue was hazardous. Plaintiff noted that Ramdas, like all cyclists, had a duty to control his speed as he approached the intersection. Citing, *e.g.*, 625 ILCS 5/11-1502 (West 2020) (traffic laws apply to bicycle users); *Id*. § 1507(c) (bicycles must be equipped with a brake that adequately controls movement); *Id*. § 601(a) (no vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway, or endangers the safety of any person or property. The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection, *** [or] when approaching a hill crest[.] Speed must be decreased as may be necessary to avoid colliding with any person or vehicle[.]). Because plaintiff *did not allege* that the slope made it in any way difficult, let alone unreasonably difficult, for Ramdas or any other cyclist to control his speed, plaintiff's allegation that Ramdas gathered speed heading into the intersection was an allegation of a *dangerous use* of the trail rather than an allegation of a *dangerous condition* on the trail as would be necessary to support a section 3-103(a) claim. Citing *Santelli v. City of Chicago*, 222 Ill. App. 3d 862, 867 (1991) (a vehicle that launched itself over a raised meridian on an "S" curve engaged in a dangerous use of the road and was not confronted with a dangerous condition on the road for the purposes of section 3-103(a)). The trial court agreed, granting the motion to dismiss without prejudice.

¶ 11                                B. Operative Complaint

¶ 12         On January 26, 2023, plaintiff filed a third amended complaint, which she thereafter sought to amend due to a clerical error. On February 17, 2023, plaintiff filed the operative, fourth amended complaint, which alleged as follows. At the southwest corner of the intersection, bushes and shrubbery on a private residential lot limited the ability of cyclists traveling east down

6

Lawrence to see traffic heading north down Garden, and vice versa. Ramdas had been traveling east down Lawrence and the motorist who struck him had been traveling north down Garden. There were no traffic control devices at the Lawrence and Garden intersection.

¶ 13        The municipal defendants exercised control and/or ownership over the portion of the trail between Mallard Lake and Springfield Park. Their decision to route the trail over Lawrence increased the number of bike users that would travel east on Lawrence toward the intersection. In 2014, the Donmore subdivision was built "just southeast" of the intersection. A person testified at a hearing to his opinion that the subdivision should not have vehicular access to the trail. It was agreed that the subdivision would not have vehicular access to the trail and only a sidewalk path was provided. (The record elsewhere establishes that the subdivision contained eight homes.)

¶ 14        In 2016, the Township and the Village widened Garden south of the intersection and Lawrence east of the intersection.

¶ 15        "For several years prior to 2020," an automobile dealership on the southwest corner of Lake and Garden (the only vehicular street entrance to the intersection), used Garden as a "test track" for its customers.

¶ 16        In June of 2020, a bicyclist heading east on Lawrence was hit by a vehicle at the intersection. (Plaintiff did not allege on which street and in which direction the vehicle traveled.)

¶ 17        Plaintiff alleged that, "At all relevant times, the extended downhill slope of Lawrence Avenue that caused bicyclists to gain speed as they approached the aforementioned intersection, coupled with the limited visibility [near] the intersection, caused *unprotected* bicyclists to be unprepared and unready to encounter vehicles traveling north and south on Garden Avenue." (Emphasis added.) Plaintiff also alleged that, "After the bicyclist was hit in June of 2020, the [municipal defendants], knew or should have known that the design and/or plan they adopted to

7

have an off[-]street portion of bike trail that descended downhill for over 100 meters into an *unprotected intersection* that provided limited visibility for oncoming vehicles and bicycles was a condition that was not reasonably safe for bicyclists and was, in fact, a hazard." (Emphasis added.)

¶ 18    Plaintiff again claimed that the municipal defendants were negligent and/or willful and wanton in that they:

"Constructed and/or created a condition pursuant to a plan and/or design for a bike trail that was hazardous, as described above, that was not reasonably safe and failed to mitigate the condition when it appeared from its use that it was not reasonably safe and failed to address the danger after other persons were injured in a similar manner as the decedent."

¶ 19                                C. Dismissal

¶ 20    The municipal defendants moved to dismiss pursuant to section 2-619.1. Under section 2-615, they argued that, despite the additional alleged facts—the shrubbery on the private lot, increased traffic from a test track that was used "prior to 2020," and increased pedestrian and bicycle traffic from the Dunmore subdivision—plaintiff's assertion that the portion of the trail at issue presented a dangerous condition under section 3-103(a) remained conclusory. Plaintiff could not rely on the municipal defendants' decision to route the bicycle trail through an intersection without a traffic control device because that decision implicated section 3-104 absolute immunity. Under section 2-619, they argued that plaintiff's section 3-103(a) claim once again centered upon their failure to provide a traffic control device at the intersection. As such, section 3-104 provided absolute immunity. Also under section 2-619, the Village argued that it could not be liable under section 3-103(a) because it did not own the intersection or the land immediately adjacent to the intersection.

8

¶ 21    The trial court granted the motion to dismiss with prejudice, agreeing with both section 2-619 arguments. It found that the section 2-615 portion of the motions was "moot." This timely appeal followed.

¶ 22                                              II. ANALYSIS

¶ 23    Plaintiff challenges the trial court's section 2-619 dismissal and, because we may affirm the dismissal on any basis, also argues that her complaint should survive a section 2-615 dismissal motion. Plaintiff contends that she filed a proper claim for negligence and/or willful and wanton conduct under section 3-103(a) of the Act. She contends that her theory is not simply that the municipal defendants were negligent due to their initial failure to provide a traffic control device, but that their *entire design* and plan for the trail on Lawrence was dangerous and had shown itself to be dangerous. She argues that a defendant cannot "escape the liability codified in section 3-103[(a)] by invoking the [narrow] immunity afforded by section 3-104." The municipal defendants respond that acts or omissions for which section 3-104 of the Act provides absolute immunity cannot form the basis of a section 3-103(a) claim. For the reasons that follow, we agree with the municipal defendants that section 3-104 of the Act provides them with absolute immunity against plaintiff's section 3-103(a) claim. As such, the trial court properly dismissed the claims against the municipal defendants pursuant to section 2-619 of the Code based on immunity and we need not address the remaining arguments.

¶ 24    The court may dismiss a complaint pursuant to section 2-619(a)(9) when "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2020). An affirmative matter is something in the nature of a defense that negates the cause of action completely. *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367 (2020). Immunity under the Act negates the cause of action

9

completely and provides a proper basis for a section 2-619(a)(9) dismissal. *Id.* A court may dismiss a complaint pursuant to section 2-615 when it is legally deficient on its face. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 429 (2006). The plaintiff must allege facts sufficient to bring the claim within a legally recognized cause of action, not merely conclusions. *Id.* When ruling on a motion to dismiss, the trial court views the pleadings and documents in a light most favorable to the non-movant. *Marshall*, 222 Ill. 2d at 429; *Van Meter*, 207 Ill. 2d at 367-68. We review the trial court's dismissal *de novo. Marshall*, 222 Ill. 2d at 429; *Van Meter*, 207 Ill. 2d at 368.

¶ 25     "The [Act] adopted the general principle that local governmental units are liable in tort[.]" *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006). Thus, just like a private tortfeasor, a municipality must "exercise ordinary care to maintain its property in a reasonably safe condition." 745 ILCS 10/3-102(a) (West 2020) ("Care in maintenance of property; constructive notice"). However, the Act limits the municipality's liability with an extensive list of immunities based on specific governmental functions." *Judge*, 221 Ill. 2d at 215. Two such immunities are set forth in sections 3-103 and 3-104 of the Act.

¶ 26     Section 3-103(a) of the Act provides:

> "A local public entity is *not* liable under this Article for an injury caused by the adoption of a plan or design of a construction of, or an improvement to public property where the plan or design has been approved in advance of the construction or improvement by the legislative body of such entity or by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved. *The local public entity is liable, however, if after the execution of such plan or design it appears from its use that it has*

*created a condition that it is not reasonably safe.*" (Emphases added.) 745 ILCS 10/3-103(a) (West 2020).

¶ 27     Section 3-104 of the Act provides:

"Neither a local public entity nor a public employee is liable under this Act for an injury caused by the failure to initially provide regulatory traffic control devices, stop signs, yield right-of-way signs, speed restriction signs, distinctive roadway markings or any other traffic regulating or warning sign, device or marking, signs, overhead lights, traffic separating or restraining devices or barriers." 745 ILCS 10/3-104 (West 2020).

¶ 28     Though section 3-103(a) provides immunity for poor design, plaintiff relies upon the exception to that immunity contained within the last sentence of section 3-103(a) as the basis for its cause of action. This is permitted but, as we discuss, the context matters.

¶ 29     The exception contained within section 3-103(a) is considered an extension of the general duty to maintain property codified in section 3-102(a). *Curtis v. Cook County*, 98 Ill. 2d 158, 165 (1983); *Boub v. Township of Wayne*, 291 Ill. App. 3d 713, 723 (1997). Indeed, if there is no liability under section 3-102(a) (failure to maintain property), there can be no liability under section 103(a) (failure to mitigate a known dangerous design). *Curtis*, 98 Ill. 2d at 165. To be liable under section 3-102(a), the municipality must own the property. *Waring v. Joliet*, 2012 IL App (3d) 110309, ¶ 28. Whereas section 3-102(a) and its extension set forth in the last sentence of section 3-103(a) codify liabilities, section 3-104 provides absolute immunity against them. *Gresham v. Kirby*, 229 Ill. App. 3d 952, 959 (1992); *Newsome v. Thompson*, 202 Ill. App. 3d 1074, 1078-79 (1990).

11

¶ 30       Three cases illustrate the mechanics of section 3-103(a): *Cole v. City of East Peoria*, 201 Ill. App. 3d 756 (1990), *Santelli*, 222 Ill. App. 3d 862, and the primary case upon which plaintiff relies, *Jorgensen v. Whiteside*, 233 Ill. App. 3d 783 (1992).

¶ 31       In *Cole*, the plaintiff's child was injured when the tire of her bicycle fell through a sewer grate, the openings of which ran parallel to the road and contained no cross bars. *Cole*, 201 Ill. App. 3d at 757. The appellate court determined that a question of fact precluded summary judgment for the municipality. *Id*. at 761-62. It explained:

> "Under section 3–103(a) of the Act, the City has immunity for the plan or design of the sewer grating, because the record shows [the] Illinois Department of Public Works approved the design at the time of the construction project. However, under section 3–103(a), the City does not have immunity, if after the sewer grating was put in, 'it [appeared] from its use that [the design] has created a condition that it is not reasonably safe.' " *Id*. at 761 (quoting Ill. Rev. Stat. 1987, ch. 85, par. 3-103(a)).

The court noted that the documents on file contained evidence that the municipality had been aware of its dangerous design for nine years preceding the child's accident—and had begun replacing the grates at issue with a safer design—and that there had been at least one prior accident involving a bicycle wheel falling through the grate. *Id*. Plaintiff's section 3-103(a) claim remained viable. *Id*.

¶ 32       In *Santelli*, the municipality improved a portion of the street by adding a raised median strip that divided the north and southbound lanes, which followed an "S" curve. *Santelli*, 222 Ill. App. 3d at 864-65. A motorist traveling south on the "S" curve struck and crossed over the raised median strip, fatally injuring the plaintiff's decedents. *Id*. at 865. The plaintiff alleged, *inter alia*, that the municipality knew or should have known of the median strip created the unreasonable danger of launching vehicles into oncoming traffic and that the municipality breached its duty to

12

remove a dangerous condition. *Id*. The trial court dismissed the complaint pursuant to section 2-615 of the Code and denied leave to amend. *Id*. at 866.

¶ 33     The appellate court affirmed the dismissal but granted leave to amend. *Id*. at 871. It explained as follows. To state a cause of action, a complaint must: (1) set forth a legally recognized cause as its avenue of recovery; and (2) it must be factually sufficient. *Id*. at 866.

¶ 34     The plaintiff met the first criteria. He set forth a legally recognized cause under section 3-103(a) by alleging that the improvement—a raised median along an S-curve—had proved through its use to be dangerous. *Id*. at 867. The municipality could not be liable for failing to improve its streets, but, once it undertook the improvement, it could be liable if the improvement created an unreasonably dangerous condition. *Id*. Critically, the improvement *itself* must create the unreasonably dangerous condition. *Id*. A dangerous *use* of the improvement does not render the improvement dangerous. *Id*. The plaintiff correctly alleged that the raised median, itself, was an unreasonably dangerous condition. *Id*. at 868.

¶ 35     However, the plaintiff failed to meet the second criteria. A complaint must contain facts necessary for a plaintiff to recover; mere legal conclusions are insufficient. *Id*. at 870. The plaintiff failed to alleged *how* the raised median, itself, was dangerous. *Id*. Thus, the trial court properly dismissed the complaint as the plaintiff had not set forth a factually sufficient section 3-103(a) claim. *Id*. at 871. (The appellate court granted the plaintiff's earlier request to replead with supporting facts. *Id*.)

¶ 36     In *Jorgensen*, the municipality undertook to design a temporary international terminal at O'Hare airport. *Jorgensen*, 233 Ill. App. 3d at 785. As part of the design, the municipality placed the taxicab and limousine loading zone on the left side, the bus loading zone on the right side, and a single lane of through traffic in the middle. *Id*. The municipality provided barriers from the

13

traffic for the taxicabs and limousines but not for the buses. *Id*. Unlike any other terminal in the airport, the design did not separate arrivals and departures. *Id*. In addition, the curved road required vehicles to continuously turn toward, rather than away from, the bus loading zone. *Id*.

¶ 37    The plaintiff was injured when a shuttle bus entered the bus loading zone and struck her. *Id*. She had been loading her luggage into the bay, as directed by the bus driver. *Id*. The plaintiff argued that the municipality was liable pursuant to section 3-103(a), in that it executed a plan or design for the temporary terminal that created an unsafe condition. *Id*. Specifically, the plaintiff alleged that the municipality was aware that it exposed the bus loading zone to through-lane traffic. *Id*. The case proceeded to trial and the plaintiff prevailed at trial and on appeal. *Id*. at 786.

¶ 38    The critical question in *Jorgensen* on appeal was whether the plaintiff could be considered a permitted *and intended* user of the road so as to implicate section 3-102(a) and, as an extension, 3-103(a) liability. *Id*. at 787. Indeed, the supreme court has repeatedly identified *Jorgensen's* precedential value to be its elucidation of a narrow exception to the general rule that pedestrians are not intended users of the roadway so as to trigger a municipality's duty to maintain the roadway for their foreseeable use. *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 159 (1995). That narrow exception set forth in *Jorgensen* "concerns only the permitted and intended use of the street immediately around a legally parked vehicle by its exiting and entering operators and occupants." *Curatola v. Village of Niles*, 154 Ill. 2d 201, 213 (1993).

¶ 39    The municipality secondarily argued that section 3-104 provided it with immunity for failing to provide barriers between the bus loading zone and the through-lane traffic. *Id*. at 788. The appellate court disagreed that the case was about the failure to place a barrier and instead was predicated on the municipality's creation of a dangerous condition, *i.e.*, its general placement of the bus loading zone with all its attendant characteristics. *Id*. at 788-89.

14

¶ 40     *Cole*, *Santelli*, and *Jorgensen* inform our understanding of section 3-103(a) as follows. *Cole* set forth a textbook section 3-103(a) claim. Per section 3-103(a), the municipality has no liability for its poor design due to its approval by the appropriate governing body. *Cole*, 201 Ill. App. 3d at 761. However, per the last sentence of section 103(a), the municipality has liability for a poor design after it becomes aware that it has created a dangerous condition. *Id*. *Santelli* added two important points: (1) the improvement *itself* must be dangerous and it is not enough that the improvement lends itself to a dangerous use; and (2) a plaintiff must plead *how* the improvement itself, as opposed to its use, is dangerous. *Santelli*, 222 Ill. App. 3d at 867, 871. Finally, *Jorgensen* confirms that, where a pedestrian is an intended user of the road, the municipality may be liable for its design under section 3-103(a). *Jorgensen*, 233 Ill. App. 3d at 787.

¶ 41     Plaintiff cites *Jorgensen* for its statement that a municipality "may not escape liability from section 3-103[(a)] of the Act by raising the immunit[y] contained in section 3-104[.]" *Id*. at 790. Plaintiff relies on this isolated quote to support its position that a section 3-103(a) claim can survive even if the dangerous condition at issue implicates section 3-104 absolute immunity. However, *Jorgensen* merely held that section 3-104 immunity did not apply under the facts of the case. *Id*. at 788-89. Section 3-104 provides immunity against section 3-102(a) claims and, by extension, section 3-103(a) claims, not the other way around, as explained in *Newsome*, 202 Ill. App. 3d 1074, *West v. Kirkham*, 147 Ill. 2d 1 (1992), *Sexton v. City of Chicago*, 2012 IL App (1st) 100010, *Gresham*, 229 Ill. App. 3d 952, and *Corning v. East Oakland Township*, 283 Ill. App. 3d 765 (1996).

¶ 42     In *Newsome*, the plaintiff was injured while riding his motorcycle in a construction zone when a motorist performed an illegal u-turn. *Newsome*, 202 Ill. App. 3d at 1081-82. The plaintiff argued that the municipality breached its duty, codified in section 3-102(a) of the Act, to keep its

15

property in reasonably safe condition. The plaintiff also argued that, while there is no duty to make a public improvement, public improvements, once made, must be undertaken in a reasonably safe manner. *Id*. at 1077. The plaintiff alleged that the municipality failed to erect warning signs, barricades, or other protective devices between the traffic lanes. *Id*. at 1076. The appellate court determined that the plaintiff's claim that the construction zone portion of the street constituted a dangerous condition was "immaterial" given the municipality's section 3-104 absolute immunity from liability for failure to provide warning signs, barricades or other protective devices in the construction zone. *Id*. at 1078-79.

¶ 43       In *West*, the plaintiff motorist traveled south toward the intersection and was in the process of turning left when she was struck by a north-bound motorist. *West*, 147 Ill. 2d at 3-4. The *West* court's analysis implicitly accepted that there had been a prior accident at the intersection. *Id*. at 6. The intersection was controlled by "stop and go" traffic lights in all four directions. *Id*. at 4. There was a left turn arrow for northbound traffic but there was no left turn arrow for southbound traffic. *Id*. at 4. When a southbound vehicle turned left, it entered the beginning of an unpaved portion of the road. *Id*. at 4, 12. In addition, there was a "dip" just south of the intersection that momentarily obscured a view of northbound traffic. *Id*. The plaintiff alleged that the municipality was negligent for failing to install a left turn arrow for southbound traffic. *Id*. The trial court determined that section 3-104 provided the municipality with absolute immunity. *Id*. at 5.

¶ 44       The supreme court affirmed, reasoning that plaintiff's claim that the municipality failed to install a left turn arrow for southbound traffic fit squarely within section 3-104. *Id*. The supreme court then proceeded to reject a series of arguments by the plaintiff. *Id*. at 6. The plaintiff argued that the language of section 3-104 granting immunity for the failure to "initially" provide a traffic control device meant that the municipality was immune only if it was without notice that the lack

16

of the device created a dangerous condition. *Id*. at 6. In the plaintiff's view, section 3-104 bestowed immunity only for an initial injury and, once a municipality was aware that the failure to provide a particular device caused an injury, section 3-104 could not provide immunity for subsequent injuries. *Id*. The supreme court rejected that argument, explaining that the plaintiff read a substantial limitation into section 3-104 immunity where none existed. *Id*. at 6-7. "The language of [section 3-104] is unconditional; no reference is made in section 3-104 to notice or lack of notice[.]" *Id*. at 7. Had the legislature wanted to include an actual or constructive notice requirement, it could have easily done so, as it had in sections 3-102(a) and 3-103(a). *Id*. at 7. The plaintiff next argued that her claim was not premised on the municipality's "initial" failure to provide a traffic control device because the municipality had provided a left turn arrow for northbound traffic. *Id*. at 10. The plaintiff argued that the municipality's partial regulation of the intersection rendered section 3-104 inapplicable. *Id*. The supreme court rejected that argument, explaining that "[a] creative plaintiff, seeking to premise an action on the failure to provide a particular traffic device, could always circumvent section 3-104 by finding and pointing out some *other* traffic device that *was* provided." *Id*. Finally, the plaintiff argued that the municipality's decision to provide stop and go traffic lights with a left turn arrow for northbound traffic but no left turn arrow for southbound traffic constituted a known, unsafe "plan or design" so as to invoke section 3-103(a) liability. *Id*. at 13. The supreme court rejected the argument, explaining that such an interpretation of "plan or design" would render the immunity of section 3-104 meaningless. *Id*.

¶ 45        In *Sexton*, the plaintiff's decedent exited the highway, proceeded on the exit road to the first intersection, turned right, and, after driving 200 feet, was fatally struck by a train. *Sexton*, 2012 IL App (1st) 100010, ¶ 5. The Metra owned and operated the crossing gate and lights at the track, but the municipality owned and operated a traffic preemption system at the preceding

17

intersection. *Id*. The preemption system allowed right turns on a red light. The plaintiff filed a complaint against the municipality, arguing that the municipality negligently failed to include in its traffic preemption system "a blank-out sign or warning signal, which would alert drivers that they would be crossing a train track immediately after [turning]." *Id*. ¶ 1. The plaintiff also argued that the municipality should have prohibited right turns on a red light. *Id*. ¶ 62.

¶ 46        A section 3-102(a) failure-to-maintain theory was advanced. *Id*. ¶ 45. The appellate court determined that the case involved an initial failure to place a traffic device, triggering immunity under section 3-104, rather than liability for failure to maintain an improvement under section 3-102. *Id*. ¶ 62. The majority reasoned that the only way to disallow a right turn on red would be to add an additional sign. *Id*. The dissent disagreed, reasoning that the municipality had already adopted and embarked on a traffic control system at the intersection, had improved it a few years before the accident, and had failed to incorporate a no right turn on red as IDOT had recommended. *Id*. ¶¶ 87, 90 (Howse, J., dissenting). The dissent therefore opined that the issue was not the initial failure to install a traffic control device. *Id*. ¶ 90.

¶ 47        In *Gresham*, 229 Ill. App. 3d at 953-54, the plaintiff's decedent died in an automobile accident at the intersection of a road owned by the defendant municipality and a state highway. In the year preceding the accident, *there were eight other accidents* at the intersection, including a fatality. *Id*. at 954. The plaintiff argued that the municipality breached its duty, codified in section 3-102(a) of the Act, to maintain its property in a reasonably safe condition for the benefit of intended users when it has notice of an unsafe condition. *Id*. at 958. The plaintiff alleged that, among other failings, the municipality should have provided a four-way stop, installed other intersection controls, or closed the intersection. *Id*. The appellate court expressed doubt that such failings were encompassed within a section 3-102(a) duty to maintain municipal property and,

18

moreover, determined that "section 3-102(a) of the Act requires a local entity to maintain its property in a reasonably safe condition, 'except as otherwise provided[,]' *** but section 3-104, granting [absolute] immunity for the initial failure to provide traffic control devices, is a section which 'otherwise provides.' " *Id.* at 959.

¶ 48 In *Corning*, 283 Ill. App. 3d at 766, the plaintiff was injured when she drove through a "T" intersection in the middle of the night. The road curved about 200 meters prior to the intersection, and a sign warned of the curve. *Id.* The intersection was "unlit and obscured from motorists' view by tall corn growing in the surrounding fields." *Id.* The municipality had previously erected a stop sign at the intersection, but it had been removed by persons unknown. *Id.* The plaintiff sued the municipality, arguing that it breached its duty, codified in section 3-102(a) of the Act, to maintain the intersection in a reasonably safe condition. *Id.* The trial court dismissed the complaint, appearing to agree that section 3-104 immunity precluded the plaintiff's claim. *Id.* at 767.

¶ 49 The appellate court reversed, holding that section 3-104 did not apply. *Id.* at 771. The court explained that section 3-104 absolutely immunizes a public entity's *initial* failure to erect a traffic warning device. *Id.* at 770. Section 3-104 immunity is not implicated once a traffic warning device is erected (and later removed). *Id.* at 770-71. The appellate court concluded: "Here, defendants provided a stop sign. Had they not done so, they could not have been held liable for not posting a sign at a dangerous intersection. Once the decision to post a sign was made, they had a duty to maintain the sign with reasonable care." *Id.* at 771.

¶ 50 *Newsome*, *West*, *Sexton*, *Gresham*, and *Corning* illustrate that section 3-104 provides immunity against section 3-102(a) and, by extension, 3-103(a) claims, and not the other way around. Simply put, the initial failure to install a traffic control device cannot be an essential

19

component of a plaintiff's allegation that a municipality created a dangerous condition through its failure to maintain its property under section 3-102(a) or its plan or design under section 3-103(a). See, *e.g.*, *Newsome*, 202 Ill. App. 3d at 1078-79 (a municipality's failure to keep its property in a reasonably safe condition under section 3-102(a) cannot include the failure to provide warning signs, barricades, or other protective devices in a construction zone); see also *West*, 147 Ill. 2d at 13 (a known, unsafe plan or design under section 3-103(a) cannot include the initial failure to install a particular traffic control device, even where the municipality chose to install other traffic control devices at the subject intersection). In arguing that "[defendants cannot] escape the liability codified in section 3-103[(a)] by invoking the [narrow] immunity afforded by section 3-104," plaintiff misconstrues tort immunity principals. Plaintiff points to *Corning* in support of its position that section 3-104 immunity cannot "override" the codification of section 3-102(a) liability. However, *Corning* did not so hold. *Corning*, 283 Ill. App. 3d at 771. Rather, as in *Jorgensen*, the *Corning* court held that section 3-104 simply did not apply to the facts of its case. *Id*. Other cases explain that section 3-104 affirmatively defeats otherwise viable section 3-102(a) and, by extension, section 3-103(a) claims. See *Gresham*, 229 Ill. App. 3d at 959 (section 3-104 provides immunity against a section 3-102(a) claim); *Newsome*, 202 Ill. App. 3d at 1078-79 (same). The dispositive question is not whether plaintiff pled a "section 3-103(a) case" or a "section 3-104 case." It is certainly possible for a plaintiff to plead a section 3-102(a) or 3-103(a) case but have that case affirmatively defeated by section 3-104. The question we must answer is just how central to the allegations the absent traffic control device must be in order to invoke section 3-104.

¶ 51 We again look to *Newsome*, *West*, *Sexton*, *Gresham*, and *Corning* to answer that question. As in those cases, there may be other aspects to the design of the road that contribute to its danger.

20

There may be an accident history that makes the road a known danger.  These are the very reasons the municipality may be negligent in failing to provide the traffic control device.

¶ 52       We draw upon the *Corning* court's statement that, had the municipality never provided a stop sign in the first place, it could not have been liable for not posting a sign at a dangerous intersection.  *Corning*, 283 Ill. App. 3d at 771.  This statement shows that there may be other factors contributing to the danger of the intersection, there, a curved road, an absence of lighting, and obstructive vegetation.  *Id*. at 766.  However, if the claim's premise is that a traffic control device would have made the dangerous intersection safe, then section 3-104 is necessarily implicated.  See *id*. at 771.  If a traffic control device was never installed, section 3-104 provides absolute immunity.  *Id*.

¶ 53       In our case, as in *Corning* and *West* (obstructive dip in the road), plaintiff alleged other facts that, arguably, contributed to the danger of the intersection—the transition from the wetland to the "on-road" portion of Lawrence, the hidden driveway, the slope preceding the intersection (a 13 foot drop over 328 feet), the shrubbery on private property at one corner of the intersection, and the motorists and pedestrians sharing the road.  However, as the case law demonstrates, the municipal defendants were absolutely immune from any claim that they failed to make the intersection safe through the installation of a traffic control device.

¶ 54       Plaintiff implicitly casts the entire path design as dangerous, but the claim at issue necessarily focuses on the intersection and not the path in general.  Any assertion to the contrary amounts to creative pleading.  See, *e.g.*, *West*, 147 Ill. 2d at 10, 13 (cautioning that a creative plaintiff could always point to some other aspect of the design to distract from its central allegation).  Indeed, the operative complaint reinserted the problematic language from the first amended complaint—that the trail descended downhill for over 100 meters into an "unprotected

intersection." Plaintiff did not disagree at oral argument that "unprotected intersection" meant "uncontrolled intersection," *i.e.*, an intersection lacking a warning sign and/or traffic control device. Plaintiff does not allege that an accident was likely to occur due to the municipalities' alleged acts or omissions *at any other point on the path*—not at the transition point or at any other point along the sloped road. Under plaintiff's theory, the other factors—the preceding transition, the fact that the "on-road" portion of the trail was shared with motor traffic (specifically from an automobile dealership) and foot traffic (specifically from a new subdivision), the preceding slope, and the shrubs on private property—made it difficult for bicyclists and motorists to be aware of one another *at the "dangerous" intersection* so as to stop and avoid an accident. However, again, a municipality is absolutely immune for its failure to install a traffic control device at an otherwise "dangerous" intersection.

¶ 55 The centrality of the intersection and its absent traffic control device to the facts of this case is highlighted when one considers that plaintiff otherwise failed to plead sufficient facts in support of a section 3-103(a) case. For example, if the absent traffic control device *is* essential to the allegation of a known, dangerous condition, then section 3-104 immunity defeats plaintiff's claims and a section 2-619 dismissal is proper. If the absent traffic control device is *not* essential to the allegation of a known, dangerous condition, then plaintiff has failed to plead facts to support *how* routing bicycles through this intersection is dangerous and a section 2-615 dismissal is appropriate. See *Santelli*, 222 Ill. App. 3d at 871 (the improvement *itself* must create the dangerous condition and it is not enough for an improvement to be *used* in a dangerous manner). Plaintiff has alleged that a bicyclist would gather speed traveling down a 328-foot-long hill with a 13-foot descent. Plaintiff provides no factual allegations to support whether the slope is gentle or steep, commonplace or unusual terrain. She does not dispute the municipal defendants' rise-over-run

22

data points or their characterization of the hill as "small." More critically, she has not made the corresponding allegation that a cyclist would have difficulty controlling his speed down such a slope, such that the *slope itself*, rather than the *use of the slope*, would be dangerous. Per *Santelli*, this allegation, or an analogous one, is necessary to avoid pleading a mere conclusion of danger. Plaintiff makes no claim that the trial court was wrong to dismiss her second amended complaint, which had removed allegations concerning the missing traffic control device, and instead argues that the addition of new facts in the operative complaint concerning privately owned shrubs at one corner of the intersection and increased traffic from an automobile dealership were sufficient for her claims to survive. However, plaintiff does not disagree that the municipal defendants had no duty to trim back shrubbery on private property. See *Pyne v. Witmer*, 159 Ill. App. 3d 254, 262 (1987) (no duty for landowners to remove foliage for the benefit of motorists' vision). Plaintiff does not allege that the shrubbery prevented cyclists from seeing the intersection to be able to take appropriate precautions, nor does she allege that increased traffic from the automobile dealership had anything to do with the accident. The history of plaintiff's pleadings, including her removal and subsequent reinsertion of the phrase "unprotected intersection," show that this case, at its core, is about the failure to place a traffic control device at the intersection of Lawrence and Garden. Section 3-104 provides the municipal defendants with absolute immunity against that claim.

¶ 56                                III. CONCLUSION

¶ 57        The judgment of the circuit court of Du Page County is affirmed.

¶ 58        Affirmed.

23